**GOUGH INDUSTRIES, INC., Debtor, Appellant,**

**v.**

**Don ROTHMAN (successor to A. J. Bumb, deceased), Receiver, State Board of Equalization, Appellees.**

**No. 24507.**

United States Court of Appeals, Ninth Circuit.

June 22, 1971.

Leonard Leibow (argued), of Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for appellant.

C. E. H. McDonnell (argued), Los Angeles, Cal., Neal J. Gobar, Deputy Atty. Gen. (appeared), Evelle J. Younger, Atty. Gen., San Diego, Cal., for appellees.

Before CARTER, HUFSTEDLER, and TRASK, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Gough Industries, Inc., the reorganized debtor, appeals from an order denying its petition to review the referee's disallowance of Gough's claims against the receiver A. J. Bumb [1] and the debtor estate for penalties and interest assessed against Gough for late payment of California sales and use taxes.

This dispute concerns the construction of the plan for arrangement, the receiver's implementation of the plan's provisions, and the proper attribution of certain tax credits granted to the estate. On September 14, 1964, Gough petitioned for a section 322 arrangement under Chapter XI of the Bankruptcy Act. The plan of arrangement, as amended, provided that Gough, a wholesaler of electrical supplies, appliances, and other items, would pay to the receiver the cash value of the Supply and Lamp Division's inventories and related assets and thereafter operate that division for its own account. The remaining assets would be converted into cash and distributed to Gough's creditors in accordance with the arrangement.

The plan of arrangement classified Gough's creditors and defined the classes. Priority debts were defined as "those which fall under the provisions of Sections 64(a) (2), (4), and (5) of the Bankruptcy Act." Expenses of administration were "those expenses commonly known as Court expenses of administration incurred herein which may be approved, allowed or ordered paid by the Court." The plan further provided that

---

1. A. J. Bumb died during the pendency of the appeal, and Don Rothman was substituted for appellee Bumb.

the receiver would pay the costs of administration and priority debts from the fund created by the liquidation of assets. In regard to taxes, the plan provided: "All tax claims shall be paid in full and in such manner and at such time as may be agreeable to the taxing agencies."

On December 17, 1964, the referee confirmed Gough's amended plan, thereby ordering payment to priority creditors, revesting in Gough the assets of the Supply and Lamp Division "free and clear of any claims, liens or liabilities whatsoever, which are dischargeable," and discharging Gough "from all its dischargeable debts, claims and liabilities, as provided in the Bankruptcy Act."

On January 8, 1965, the California State Board of Equalization filed a proof of its priority claim for $86,769.-88. This sum included $85,978.95 for prearrangement sales and use taxes and $790.93 in interest accrued prior to the September 14 filing of Gough's Chapter XI petition.

Gough's receiver paid $58,321.45 on this claim on May 25, 1966. Additionally, the receiver obtained tax credits for bad debts taken by Gough for income tax purposes which canceled the remainder of the State Board's initial claim. However, the State Board claimed another $25,263.38 from Gough as of December 1, 1966. This sum included $8,-741.78 in interest on the unpaid taxes accruing from September 14, 1964, plus $16,521.60 in penalties. The penalty sum represented $7,923.70 assessed prior to commencement of the Chapter XI proceedings and an additional $8,597.90 assessed on February 4, 1965, for nonpayment of the taxes and prearrangement interest and penalties.

On October 19, 1967, Gough sought an order requiring the Chapter XI estate to pay the accrued interest and penalties and to enjoin the State Board of Equalization from attempting to collect any monies from Gough. After holding an evidentiary hearing, the referee made the following findings of fact:

At the time the court confirmed Gough's plan of arrangement, the receiver did not possess funds sufficient to pay all creditors in full; he did possess enough funds to pay all priority debts in full, including all tax claims with penalties and interest. However, the court did not intend that the order confirming the arrangement would relieve Gough of nondischargeable liabilities or require the receiver to pay any tax liabilities not allowable in straight bankruptcy proceedings. The $86,769.88 in taxes and prebankruptcy interest claimed by the State Board was the only amount properly allowable in bankruptcy.

The referee further found that the receiver paid all tax claims by May 25, 1966: On or about November 10, 1965, the receiver paid certain tax claims totaling $22,398.17; each payment equaled the amount claimed by the taxing authority. On May 25, 1966, he paid the State Board's claim. The receiver had not made an earlier payment to the State Board because he desired to verify the claim and to obtain the credits for bad debts.

From these findings, the referee concluded that the plan of arrangement and the confirmation order did not require the estate to pay the penalties and post-arrangement interest. Also, the bad debts were includable in the property of the Chapter XI estate at the time of the arrangement; under the plan, the bad debts passed to the receiver for the creditors' benefit. Thus, the credit of $28,-448.43 was an asset of the estate and never revested in Gough. Additionally, the receiver's delay in paying the State Board's claim arose from a reasonable business judgment.

The referee further concluded that the penalties and interest were nondischargeable debts and that the State Board could not properly set off the tax credit against the penalties and interest.

The referee refused to enjoin the State Board's efforts to collect the liabilities assessed against Gough. The bankruptcy court denied Gough's petition for

review of the referee's order, and Gough appeals from that order.

Gough argues that three of the referee's adverse findings and conclusions are clearly erroneous: First, Gough says that the referee erred in determining that the estate was not liable for the penalties and interest, based upon its reading of the language of the plan of arrangement. The "tax claims" which the plan directed the receiver to pay from the deposit are those entitled to priority under section 64(a) (4) of the Bankruptcy Act (11 U.S.C.A. § 104(a) (4)). At the time Gough drafted its plan, section 64(a) (4) gave priority to "taxes legally due and owing by the bankrupt to * * * any State or any subdivision thereof * * *." [2] Because the penalties and interest were due and owing, Gough concludes that they were priority debts that the receiver should have paid from the deposit.

The difficulty with Gough's argument lies in its attempt to number all tax claims among priority debts. The plan defines priority debts as "those which fall under the provisions of Section 64a(2), (4), and (5) of the Bankruptcy Act." The plan's citation of the Bankruptcy Act strongly suggests that definitions and liabilities commonly imposed by the Act are to control unless explicitly countermanded. If the Act precludes allowance of the disputed tax claims against a debtor's estate, we are constrained to disallow the claims unless the plan provides for them.

■ Under the Act, the disputed claims are normally not allowable as priority debts. Section 57(j) of the Act (11 U.S.C.A. § 93(j)) precludes allowance of that portion of the penalties incurred by Gough prior to the arrange-

ment. (Boteler v. Ingels (1939) 308 U. S. 57, 59, 60 S.Ct. 29, 84 L.Ed. 78; California State Bd. of Equalization v. Goggin (9th Cir.) 183 F.2d 489, 493, cert. denied (1950) 340 U.S. 891, 71 S.Ct. 207, 95 L.Ed. 646; see World Scope Publishers, Inc. v. United States (2d Cir. 1965) 348 F.2d 640, 641.) Also precluded is the postpetition interest. (United States v. General Eng'ring & Mfg. Co. (1952) 342 U.S. 912, 72 S.Ct. 358, 96 L.Ed. 682, aff'g (8th Cir. 1951) 188 F.2d 80; see Nicholas v. United States (1966) 384 U.S. 678, 682–91, 86 S.Ct. 1674, 16 L.Ed.2d 853; New York v. Saper (1949) 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710.)

■ On the other hand, postpetition penalties incurred by the receiver in the operation of the debtor's business are allowable against the estate. (See Nicholas v. United States, supra, 384 U.S. at 692–95, 86 S.Ct. 1674; Boteler v. Ingels, supra.) Gough contends that the receiver's delay in paying the taxes caused the assessment of postpetition interest and penalties. Citing In re Samuel Chapman, Inc. (2d Cir.) 394 F.2d 340, cert. denied sub nom. New York Credit Men's Adjustment Bureau, Inc. v. United States (1968) 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258, and In re Chicago & N.W. Ry. (7th Cir. 1941) 119 F. 2d 971, Gough concludes that the estate must be liable for the penalties.

In re Samuel Chapman, Inc., supra, involved the liability of a trustee in bankruptcy for federal income and social security taxes incurred during the operation by the debtor in possession of its business under arrangement proceedings. The Second Circuit reasoned that section 57(j) of the Act proscribing the assessment of penalties against the estate did not apply to postpetition tax

2. In 1966, § 64(a) (4) of the Bankruptcy Act was amended to limit priority to taxes "which are not released by a discharge in bankruptcy * * *." Section 17(a) (1) was also amended to permit discharge of a bankrupt from provable tax claims accruing more than 3 years prior to bankruptcy. Under § 371, a Chapter XI confirmation discharges a debtor from certain debts, but debts not dischargeable under § 17 are excluded. Thus, tax claims arising within the 3-year period are not dischargeable and are entitled to priority.

Here, the State Board claimed taxes owing from April 1, 1962, to September 13, 1964. The claim arose within 3 years preceding Gough's petition and is not dischargeable.

claims. The debtor in possession was liable for the penalties, and nothing in section 57(j) required disallowance of the claims against the estate.

In re Chicago & N.W. Ry., *supra*, involved penalties for failure to pay Illinois taxes. The taxes became a lien prior to institution of proceedings under the Act, but the penalties did not accrue until 14 months after proceedings began. Because the trustee's failure to make timely payment of the taxes caused the penalty accrual, the estate was liable under the rule of Boteler v. Ingels, *supra*.

Neither party has cited or discussed our decision in California State Bd. of Equalization v. Goggin, *supra*. In *Goggin*, the debtor failed to file returns or pay California sales and use taxes prior to its petition under Chapter XI of the Act. California assessed both pre- and postpetition penalties. Under the state law, which has not been amended or repealed, the taxpayer could not avoid the postpetition penalties without paying the prepetition penalty. Because section 57(j) proscribed allowance of the prepetition penalty against the estate, the estate could not pay the first penalty and therefore could not avoid assessment of the subsequent penalties. Section 57(j), therefore, voided all penalties against the estate.

 The cases cited by Gough involved postpetition penalties that the estate could have prevented or incurred by its own operation of the debtor's business. Here, however, the receiver could not have prevented accrual of the postpetition penalty, and the postpetition penalties are not allowable unless the plan provides for them.[3]

 The plan makes no specific reference to either penalties or interest. Gough contends that the plan's direction to the receiver to pay "all tax claims," without any reference to "allowable" tax claims or of any provision for a fund to pay taxes not yet assessed, indicates that the plan required the receiver to pay all tax claims, whether allowable or not, from the deposit. That construction overlooks other portions of the plan. The provision cited by Gough deals with payment of priority claims already defined in terms of the Bankruptcy Act. It does not direct which debts the estate shall assume. The earlier citation of the Act, as contrasted to the order to pay "all" taxes, creates an ambiguity: Either the receiver is to pay all tax claims, or he is to pay priority debts as defined under the Act which excludes the claims in issue. If Gough as draftsman of the plan had intended that the receiver assume liabilities beyond those ordinarily imposed in bankruptcy, the plan could have said so. It does not. We discover no error in the referee's determination construing the ambiguity against the draftsman.

Gough also argues that testimony given by its attorney at the referee's hearing demonstrates that the draftsman intended that the receiver would pay all tax claims, regardless of their nature. The attorney testified that he, the referee, and the receiver conferred over the wording of paragraph 3 of the confirmation order which referred to the revesting of assets in Gough. The paragraph originally stated that the assets would revest "free and clear of any claims, liens or liabilities whatsoever * * *." The referee suggested inserting the phrase "which are dischargeable" after the word "whatsoever." When Gough's attorney asked the referee what he had in mind, the referee replied that "he did not feel that the creditors should hold the debtor harmless from any claims that might have arisen through fraudulent conduct and matters of that kind." The referee testified that he had no independent recollection of this conversation.

From this testimony, Gough argues that the confirmation order contemplated revesting assets in Gough free of all

---

3. A debt is "provided for" by an arrangement if the estate pays the holder of that debt some consideration. (9 W. Collier, Collier on Bankruptcy (14th ed. 1969) ¶ 9.32 [4], at 934–35.)

claims except those made nondischargeable by reason of fraud. The estate would pay all other nondischargeable claims. It says the State Board must proceed against the estate rather than against Gough.

Gough's attempt to limit its liability to debts obtained by fraudulent means is not persuasive. Section 371 of the Act (11 U.S.C.A. § 771) provides that the confirmation order

"shall discharge a debtor from all his unsecured debts and liabilities provided for by the arrangement, * * * but excluding such debts as, under section 17 of this Act, are not dischargeable."

Section 17 (11 U.S.C.A. § 35) numbers among nondischargeable debts both debts obtained by fraud and "taxes which became legally due and owing by the bankrupt to * * * any State * * *."[4] Because the plan did not expressly provide for the payment of penalties and interest, those debts are no more dischargeable than are claims based on fraud. The insertion of the phrase "which are dischargeable" specifically subjects the revested assets to all nondischargeable debts, including the tax claims.

Alternatively, Gough argues that the estate should have paid the penalties and interest as an expense of administration. At the time Gough drafted its plan, section 337(2) of the Act (11 U.S.C.A. § 737(2), as amended (Supp.1970)), provided for payment of two substantially similar types of administrative expenses. First, the section required the debtor to deposit "the money necessary to pay all debts which have priority * * *." Second, the section required the debtor to deposit

"the money necessary to pay the costs and expenses of the proceedings and

the actual and necessary expenses incurred in connection with the proceedings and the arrangement * * * in such amount as the court may allow * * *."

Section 64a(1) places among priority debts the costs of administering and preserving the estate. The expenses necessary to preserve the estate may include taxes accruing during the course of administration.[5] (See 3A W. Collier, Collier on Bankruptcy (14th ed. 1969) ¶ 62.14[3], at 1529–33 & nn. 82, 86.) If the draftsman had modeled the plan's provision for payment of administrative expenses upon the Act's provision relating to priority debts, it could be argued that the plan subsumed tax claims within expenses of administration. But the plan's language indicates that the draftsman based the definition of administrative expenses upon the second reference appearing in section 337(2).

Rather than citing section 64a(1) in the definitions of either priority debts or expenses of administration, the draftsman pointedly omitted section 64(a)(1) while defining expenses of administration as "those expenses commonly known as Court expenses of administration incurred herein which may be approved, allowed or ordered paid by the Court." The reference to allowance by the court conforms to the wording of section 337(2). Further, the plan's provision for payment of creditors also demonstrates that the draftsman intended to treat tax claims as priority debts rather than as expenses of administration. The payment provision enumerates typical costs of administration such as "the Referee's Salary and Expense Fund, Court Reporter, Appraisers, Controller, and sums to be paid to the attorneys. * * *" The expenses included under section 337(2) as costs of the proceedings generally comprise the compen-

---

4. See note 2 supra.

5. Since the plan did not provide for the penalties and interest, liability lay with the debtor. The receiver did not have to pay these claims to preserve the estate.

Furthermore, taxes qualifying as expenses of administration are normally those incurred after the petition is filed. (See Nicholas v. United States, supra, 384 U.S. at 687–88, 86 S.Ct. 1674.) Here the tax accrued prior to filing the petition.

sation of court officers and their employees and the costs they incur during administration. (8 Collier on Bankruptcy, *supra* ¶ 5.34[1], [2].) Taxes are not included. The plan's examples are consistent with the costs ordinarily subsumed under the costs of the proceedings provision of section 337(2). On the other hand, the plan specifically directs payment of tax claims as priority debts. From the language and structure of the plan, we conclude that the tax claims were not included among expenses of administration.

Second, Gough contends that the referee erred by ruling that the postpetition tax credits were not an asset of Gough. In 1965, Gough decided that certain prepetition accounts receivable were not collectible and wrote them off as bad debts for income tax purposes. In 1966, California recognized the uncollectibility of the receivables and reduced the corresponding sales and use taxes then due. Both parties have framed their arguments in terms of the transferability of the credits. We believe that our decision should rest on the transferability of the accounts receivable.

Section 70a of the Act (11 U.S.C.A. § 110a) governs the transferability of a bankrupt's assets. In a Chapter XI proceeding, section 70a determines the property of the estate that the receiver will administer. (8 Collier on Bankruptcy, *supra* ¶ 6.16[3].) Included among the items comprising the estate are "property, including rights of action, which prior to the filing of the petition he [the debtor] could by any means have transferred" and "rights of action arising upon contracts." (Bankruptcy Act §§ 70a(5) and (6).)

In Segal v. Rochelle (1966) 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428, the bankrupts suffered losses in the year of bankruptcy. The losses were carried back to previous years to offset the bankrupts' federal income tax. The issue was whether the trustee or the bankrupts were entitled to the loss-carryback tax refunds. In holding that the refunds attributable to prebankruptcy losses constituted "property" at the time the bankruptcy petitions were filed, the Court reasoned that

> "[t]he main thrust of § 70a(5) is to secure for creditors everything of value the bankrupt may possess in alienable * * * form when he files his petition. * * * Turning to the loss-carryback refund claim in this case, we believe it is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5)." (382 U.S. at 379–80, 86 S.Ct. at 515.)

The Court held that the refunds were transferable under the relevant state law, and, therefore, the trustee acquired title to the refunds under section 70a(5) of the Act. The Court declined to consider the transfer of loss-carryovers, but it recognized that these were conceptually and practically distinguishable from loss-carrybacks.

Gough argues that if *Segal* controls, the tax credits are analogous to a carryover. Gough appears to reason that the sales were a past event that gave rise to a present tax credit for the bad debts just as a prior loss creates a present credit for the carryover. We do not agree that the credits are like a carryover, either conceptually or equitably. The difficulty with the analogy lies in determining which event gives rise to the credits. For example, if the estate had no income in the year the debts were written off (the present event), the write-off would create a loss that could be applied against past income just as in the case of a carryback. Although the sale is the initial taxable event, the write-off creates the credits. Because the present write-off generates the tax credits, this situation is equally analogous to a carryback. Equitably, however, the credits are substantially closer to a carryback. A carryover cannot exist until the present loss has been applied against past income. If there is any prebankruptcy income, the creditors

obtain the refund's benefits before the remaining loss is applied to future income. But if the credits are treated as a carryover and used to reduce Gough's future taxes, the creditors would be deprived of both the asset which Gough sold and the credit against the tax generated by the sale. That result is particularly unfair because the improvident sales may well have contributed to Gough's financial failure. (*See* 4A Collier on Bankruptcy, *supra* ¶ 70.28[4], at 404.)

Gough's primary argument is that *Segal* does not control. We agree that *Segal* is not controlling, but for different reasons than those advanced by Gough. In *Segal,* the dispute was over funds that the bankrupts had originally paid to the Government. There claim to those funds raised an equitable issue. But in our case the dispute involves a reduction of taxes owed by the estate. The accounts receivable generated the sales and use taxes owed by Gough. According to the plan of arrangement, these receivables passed to the estate. Confirmation of the arrangement vested title to the accounts in the receiver. (*See* Bankruptcy Act § 70i.) The estate became liable for the corresponding taxes. When the receivables were written off as bad debts, the amount of the tax became excessive. The excess was to be credited "on any amounts then due and payable *from the person from whom the excess amount was collected or by whom it was paid* * * *.*" (Cal.Rev. & Tax.Code § 6901. Emphasis added.) Because the estate and not Gough was to pay the tax, state law required crediting the excess against the taxes due and payable from the estate. The estate owed the tax, and under California law it was entitled to the credit; Gough incurred the tax, but it was absolved of liability by the arrangement. Because the funds comprising the credits came from the estate, equitable considerations differ substantially from those encountered in the loss-carryback situation where the bankrupt has provided the funds that make up the refund.

The crux of Gough's argument is that the credits are after-acquired property which could not pass to the receiver. Although it is true that property acquired by the debtor after confirmation of the plan does not ordinarily become a part of the estate (9 H. Remington, A Treatise on the Bankruptcy Law of the United States § 3644, at 304; see 4A Collier on Bankruptcy, *supra* ¶ 70.09, at 103–05), the credits are not strictly property acquired by the debtor subsequent to the confirmation. Rather, the estate as owner of the receivables acquired the credits. Proceeds of alienable property owned by the debtor at the time the petition is filed vest in the receiver. (*See id.* at 106 & n. 7.) We see no meaningful distinction between proceeds such as dividends from stock vested in the estate and the tax credits resulting from the write-off of receivables owned by the estate. Gough concedes that the accounts were correctly transferred to the estate. The credits from these accounts were never acquired by Gough and cannot be used to offset its taxes.

Third, Gough contends that the referee erred in finding that the receiver's delay in paying the state tax was justifiable. The referee found that the receiver delayed payment because he wanted to verify the tax and to obtain the bad debt credits. Gough cites the receiver's testimony that he withheld payment in order to obtain credits for uncompleted sales and sales directly by the manufacturer to the customer which had been charged to Gough, to fix an undisputed amount of the tax due less penalties and interest, and to determine whether the state would tax the estate's liquidation sales. It points out that the receiver delayed 11 months from the date of confirmation of the plan before paying two other undisputed tax claims although the monies deposited by Gough were sufficient to pay all taxes, together with penalties and interest. This delay, Gough asserts, demonstrates dilatory payment of all tax claims.

The receiver was not liable for prepetition penalties. The postpetition penalty was assessed less than one month after the state filed its claim. The accrual of this penalty cannot be attributed to dilatory acts by the receiver. Under *Goggin, supra,* the receiver could not legally have prevented the assessment. However, the postpetition interest presents different considerations.

Taxes are not accorded a greater priority than other priority debts. Indeed, under section 64(a), they are to receive fourth priority. The estate cannot be charged with postpetition interest simply because the receiver did not accord the tax claims first priority. (United States v. Kalishman (8th Cir. 1965) 346 F.2d 514, 520, aff'd sub nom. Nicholas v. United States (1966) 384 U. S. 678, 687–88, 86 S.Ct. 1674, 16 L.Ed. 2d 853.) As the Supreme Court noted in Nicholas v. United States, *supra* at 683–84, 86 S.Ct. at 1679:

> "[C]reditors should not be disadvantaged *vis-à-vis* one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws. In the context of interest-bearing debts, * * * inequity * * * would result if, through the continuing accumulation of interest in the course of subsequent bankruptcy proceedings, obligations bearing relatively high rates of interest were permitted to absorb the assets of a bankrupt estate whose funds were already inadequate to pay the principal of the debts owed by the estate."

The record does not clearly indicate that the receiver's delay was due to factors other than those inherent in bankruptcy proceedings. It also fails to disclose whether the receiver gave undue priority to claims other than the taxes. On the basis of this record, we cannot say that the referee's finding was clearly erroneous.

Affirmed.