**In re HOLIDAY MART, INC., Debtor.**

**Bankruptcy No. 77–00565.**

United States Bankruptcy Court,
D. Hawaii.

Feb. 10, 1981.

James Duca, Honolulu, Hawaii, for Gibraltar.

Arthur Reinwald, Honolulu, Hawaii, for Creditors Com.

William Dodd, Honolulu, Hawaii, for trustee.

## ORDER DIRECTING DISBURSEMENT OF FUNDS TO SECURED CREDITOR—GIBRALTAR SAVINGS ASSOCIATION

JOHN J. CHINEN, Bankruptcy Judge.

The claim of Gibraltar Savings Association (Gibraltar) came on for hearing on September 12, 1980, before the undersigned Judge of the above-entitled court. The claim arises in the case of In re Holiday Mart, Inc., Bk.No. 77–00565 (D.Hawaii, filed Dec. 30, 1977). James N. Duca of the law firm of Woo, Kessner & Duca appeared on behalf of Gibraltar. Arthur B. Reinwald of the law firm of Hoddick, Reinwald, O'Connor & Marrack appeared on behalf of the Unofficial Trade Creditors Committee, and William H. Dodd of the firm of Chun, Kerr & Dodd appeared on behalf of the Receiver, (now Trustee), Thomas Hayes.

Gibraltar, as successor in interest to First Savings Association of Corpus Christi, is one of four secured creditors with mortgage claims on Holiday Mart, Inc. Earlier this year the Receiver paid all mortgage claims of these four creditors. A reserve account was established in escrow pending resolution of disputes regarding other indebtedness owed by Debtor to Gibraltar. This opinion considers and resolves the disputed indebtedness.

Gibraltar's claim total $136,160.79 plus per diem interest of $42.96 from September 1, 1980. There are four parts to Gibraltar's claim.

(a) It claims additional interest is due upon acceleration of Debtor's promissory note ("Note") under the terms of the Note.

(b) It claims charges for late payments on the Note made by the Receiver. This claim is $6,079.50 if the acceleration interest is permitted and $30,397.50 if the acceleration interest is denied.

(c) It claims reimbursement for attorney's fees and costs under the terms of the Note.

(d) It claims under the Note interest on advances which Gibraltar made for attorney's fees and for rental payments to the ground lessor of Debtor's premises.

Based on careful consideration of the arguments of counsel, the evidence adduced, and the memoranda and records herein, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. This Chapter XI proceeding was initiated by Debtor's petition filed December 30, 1977.

2. On January 21, 1975, Debtor executed a promissory note for $1,800,000.00 in favor of Gibraltar's predecessor in interest, which Note was secured by a first mortgage on Debtor's Kailua business premises. A security interest was simultaneously taken in the equipment and fixtures in the Kailua business premises.

3. General facts about the Note are relevant here:

   (a) Interest on the principal balance was payable at 10% per annum, with monthly principal and interest installments of $17,370.00, commencing February 1, 1975, and payable on the first day of every month thereafter.

   (b) A provision in the Note provided that upon default, the interest on the outstanding principal would increase from 10% to 12%, and the balance could be accelerated without notice at the option of the holder. The Note stated:

   While any default exists in the making of any of said payments or in the performance or observance of any of the covenants or agreements of this Note or of any instrument now or hereafter evidencing or securing the indebtedness may become due and payable at once at the option of the holder hereof and without notice, and thereafter the unpaid principal shall bear interest at the rate of TWELVE PERCENT (12%) per annum. Failure to exercise this option by the holder hereof howsoever often shall not constitute a waiver of the right to exercise it thereafter.

   (c) The Note also provided for an additional five percent charge for late payments:

   If any payments or other amounts due as required by the terms of this Note or any instrument evidencing or securing same, are not paid within FIFTEEN (15) days from the due date thereof, a collection charge of FIVE PERCENT (5%) on each

dollar unpaid shall be paid by the undersigned to cover the additional cost of handling delinquent payments, and any collection charges not paid when applicable may be added to the principal balance thereof.

   (d) The Note provided that payments apply first to the interest on the unpaid principal balance and the remainder to the principal.

   (e) The Note required payment to be made at the offices of the payee in Corpus Christi, Texas.

4. The Mortgage, also signed January 21, 1975, secured the Note and any other sums advanced on behalf of or becoming owing by the Mortgagor to the Mortgagee. It provided:

   (a) The Mortgagor would pay rents due on the lease of the collateral premises;

   (b) If the Mortgagor failed to perform under any term of the mortgage, the Mortgagee could make any advances and pay any expenses necessary to protect its security;

   (c) The Mortgagor shall repay the Mortgagee for such advances and payments on demand with interest at the maximum legal rate;

   (d) "Advances, costs and expenses" include reasonable attorneys fees.

5. At the time the petition was filed (Dec. 30, 1977 the principal balance outstanding on the Note was $1,725,605.23.

6. The last payment by the Debtor prior to filing the petition was on May 1, 1977.

7. A total of $2,415,052.22 has been paid by the Debtor to Gibraltar on the Note subsequent to default. The first post-default payment was not received until March 6, 1978. The most recent payment of $1,810,796.98, representing a portion of the proceeds from sale of the Debtor's business premises, was received in Texas office of Gibraltar on April 25, 1980. The schedule of payments after default was as follows:

| Date | Payments Received |
| --- | --- |
| 03/06/78 | $ 20,591.00 |
| 03/30/78 | 20,591.00 |

| Date | Payments Received |
|------|------------------:|
| 04/18/78 | 20,591.00 |
| 06/19/78 | 20,591.00 |
| 08/10/78 | 20,591.00 |
| 10/18/78 | 20,591.00 |
| 10/23/78 | 41,182.00 |
| 11/27/78 | 20,591.00 |
| 12/26/78 | 20,591.00 |
| 01/26/79 | 20,591.00 |
| 02/13/79 | 20,591.00 |
| 03/29/79 | 20,591.00 |
| 04/30/79 | 20,591.00 |
| 06/01/79 | 20,591.00 |
| 06/08/79 | 20,591.00 |
| 07/30/79 | 20,591.00 |
| 08/31/79 | 20,591.00 |
| 09/28/79 | 20,591.00 |
| 10/29/79 | 20,591.00 |
| 11/30/79 | 20,591.00 |
| 12/—/79 | 20,591.00 |
| 01/—/80 | 20,591.00 |
| 04/25/80 | 1,810,796.98 |

8. The April 25, 1980 disbursement paid off all principal and interest on the Note at the pre-acceleration interest rate and without any late charges as are now claimed by Gibraltar.

A. *Claim for Additional Interest Upon Acceleration of Note*

9. Gibraltar claims $81,599.31 is owing as higher interest because the Note was accelerated.

10. The interest differential is claimed from December 15, 1977 to final payment on April 25, 1980.

11. Gibraltar's claims the Note was accelerated as of December 15, 1977. On that date Gibraltar's predecessor in interest sent a certified letter to Debtor to notify it that the Note was accelerated. The certified letter went unclaimed by Debtor despite several notices from the postal service.

12. The unopened envelope was submitted into evidence. The Court has opened the envelope. It contained a letter from James N. Duca on behalf of Gibraltar's predecessor in interest. The letter was a definite statement that the option to accelerate is being exercised, that the entire indebtedness is immediately due at the higher interest rate, and that the Mortgage will seek legal remedies if full payment is not made within ten days.

13. There is no evidence in the record that a similarly definite notice of acceleration reached the Debtor by any other means.

14. The monthly "loan billing statement" sent from Gibraltar to Debtor, which is in computer printout form, never showed the Note to be accelerated and never claimed any amount due as accelerated interest or as late charges. The statement for the month ending September 1, 1978, showed an interest rate of 10%. Similarly, the statement for June 1, 1980, which followed the dispersal of funds from the property sale in April 1980, showed a remaining principal due of $17,235.40, interest at 10%, and nothing owing as "other charges". This remaining principal was paid by the Receiver on September 10, 1980, with accrued interest.

15. Sometime in early 1980, the Debtor did become aware of Gibraltar's claims for amounts over and above that shown in the monthly statements. This awareness came from several sources. Gibraltar made higher claims in a January 1980 response to a form letter sent by the Receiver to all creditors. On the authority of the Receiver, Mr. George Kerr spoke to all of the lienors, including the attorney for Gibraltar, and the higher claims were discussed. There were representations at the time of the Daiei closing that higher amounts were claimed. The dispute over these claims led to establishment of the reserve accounts.

16. The Receiver and Unofficial Trade Creditors Committee contest the claim for acceleration and higher interest. They contend acceleration did not occur because, notwithstanding the terms of the Note, acceleration required an affirmative action by Gibraltar; and the only such act by Gibraltar was the certified letter which was sent but not received by the Debtor. Alternatively, the Receiver and creditors committee seek to void the higher acceleration interest as a penalty.

B. *Claim for Charges for Late Payments by Receiver on the Note*

17. Gibraltar claims the Note's provision for a five percent charge on late payments applies to payments by the Receiver. The amount claimed varies depending on whether the Note is determined to have been accelerated.

18. The Receiver made regular monthly payments as shown in finding 7 *supra*. The Receiver only made payments as they accrued during his receivership. However, at the time of the petition the Debtor was already delinquent in its payments from June 1, 1977.

19. Gibraltar claims it applied the Receiver's payments to the monthly installments as they became due. Thus, for example, the Receiver's first payment of March 6, 1978 was credited to the installment due on June 1, 1977. Gibraltar analogized this method to the "FIFO" (first-in, first out) approach to inventory accounting. Gibraltar claims that if the Note was not accelerated then each payment by the Receiver was overdue at the time it was made, and all 35 monthly installments, from June 1, 1977 to April 22, 1980, were subject to the late charge, which amounts to $30,397.50 ($17,370.00 × 5% × 35 months).

20. In the alternative, Gibraltar claims that if the Note was accelerated, then late charges are due only for pre-acceleration delinquent payments, that is for the seven months from June 1, 1977 to December 1, 1977. These claimed charges total $6,079.50 ($17,370.00 × 5% × 7 months).

21. The creditors committee contends the claim for the late charges is an unrecoverable penalty.

C. *Claims for Attorneys Fees and Costs*

22. Gibraltar seeks reimbursement for attorney's fees it paid out prior to April 21, 1980 and for estimated fees subsequent to that date. Total compensation sought is $37,928.56. Payments were made to two law firms.

23. Gibraltar paid $3,540.00 to the firm of Sims & Harpole of Houston, Texas for professional services rendered from November 27, 1977 to November 5, 1979. This fee is for 47.2 hours of time spent by Mr. John T. Sims at a rate of $75.00 per hour.

24. Gibraltar also made payments to the firm of Woo, Kessner & Duca. The timesheets attached to the affidavit of Gibraltar's counsel support billings and payment to the firm of $30,695.75 for work through April 20, 1980. This includes $28,496.75 for professional services rendered, $1,139.87 for state excise tax, and $1,059.13 for actual costs incurred. (This figure is slightly lower than Gibraltar's claim for attorney's fees in this period because of miscalculations in summarizing the figures for the period from 7/6/78 through 10/20/78.)

25. Services by the firm of Woo, Kessner & Duca included work by three persons; James N. Duca (JND), James Gamino (JG), and Wendell Y.Y. Ing (WYYI). Timesheets data show minor miscalculations. The total hours claimed for James Duca is one hour high for the period ending 4/1/78 and .3 hours high for the period ending 10/20/78. The Court therefore finds that the claim for reimbursement is based on the following hours worked and hourly rates for each individual, by time period.

| Billing Period | JND | | | JG | WYYI | | |
|---|---|---|---|---|---|---|---|
| 12/09/77–01/10/78 | 19.5 | hr at | $65 | 6.9  hr at $50 | – | | |
| 01/11/78–04/01/78 | 64.15 | " " | " | – | – | | |
| 04/03/78–06/30/78 | 58.35 | " " | $75 | – | 5.6 | hr at | $40 |
| 07/06/78–10/20/78 | 62.55 | " " | " | – | 0.2 | " " | $45 |
| 10/21/78–01/31/79 | 39.70 | " " | " | – | 4.0 | " " | " |
| 02/05/79–09/11/79 | 66.95 | " " | $80 | 2.0  hr at $60 | 13.0 | " " | " |
| 10/01/79–04/21/80 | 46.45 | " " | $90 | – | – | | |
| Total | 357.65 | | | 8.90 | 22.80 | | |

Person and Hourly Rate

26. In its original application Gibraltar also claimed $3,500.00 for estimated unbilled fees and costs incurred after April 20, 1980 by Woo, Kessner & Duca. By a supplemental statement filed January 16, 1981, Gibraltar reduced this estimate to a claim for actual fees and costs. This claim is for $1,695.00 in fees, $90.75 in costs, and $67.80 in tax, which totals $1,853.55. This supplemental amount represents work done between April 24, 1980 and January 14, 1981. It includes 18.1 hours by James Duca at $90.00 per hour and 1.20 hours by Charles S. Lima at $55.00 per hour.

27. The creditors committee contends that the claim for attorney fees is too high because much of the work was unnecessary to collect the amounts due under the mortgage held by Gibraltar.

D. *Claims for Interest on Advances by Gibraltar*

28. Gibraltar claims interest for "advances" it has made under the terms of the Note. It seeks interest at a rate of 12% per annum as provided in the Note.

29. Gibraltar claims two kinds of payments qualify as advances: payments to the firm of Woo, Kessner & Duca for legal fees; and rental payments to the lessor of the Debtor's mortgaged premises.

30. With respect to legal fees, Gibraltar made the following payments to Woo, Kessner & Duca and claims interest for the following time periods and amounts through April 25, 1980.

| Date | Amount paid | Days Interest Claimed through April 25, 1980 | Amount |
|---|---|---|---|
| 02/28/78 | $ 1,709.58 | 787 | $ 442.29 |
| 04/24/78 | 4,536.17 | 732 | 1,091.41 |
| 09/05/78 | 5,277.01 | 598 | 1,037.53 |
| 12/27/78 | 192.81 | 485 | 30.55 |
| 03/13/79 | 4,937.06 | 409 | 663.81 |
| 03/22/79 | 3,347.95 | 400 | 440.40 |
| 10/24/79 | 6,412.93 | 184 | 387.87 |
| Total | $26,413.51 | | $4,093.86 |

31. Gibraltar made two payments of lease rent to the Lessor of the Debtor's mortgaged premises. On April 13, 1978 it paid $15,403.45, and on August 14, 1978 it paid $20,591.00. It claims 788 days of interest on the first payment and 620 days on the second payment. This total $8,187.83 through April 25, 1980.

## CONCLUSIONS OF LAW

A. *Claim for Additional Interest upon Acceleration of Note*

1. Was the Note accelerated on December 15, 1977 or at any time thereafter? And if it were accelerated is the two percent interest differential valid as liquidated damages or void as a penalty?

2. The Court concludes that the Note was not accelerated on December 15, 1977, or at any time thereafter.

3. It is well established that to exercise an option to accelerate the maturity of a note the holder must take some affirmative action that evidences its intention to accelerate. The exercise of the option to accelerate must be in a manner that is clear and unequivocal and effectively informs the maker that the option to accelerate has been exercised. *Moresi v. Far West Services, Inc.*, 291 F.Supp. 586, 588 (D.Hawaii 1968); *Florance v. Friedlander*, 209 Va. 520, 523, 165 S.E.2d 388, 391 (1969); *Trigg v. Arnott*, 22 Cal.App.2d 455, 458, 71 P.2d 330, 332 (1937); *Carmichael v. Rice*, 49 N.M. 114, 117, 158 P.2d 290, 292 (1945); Annot., 5 A.L.R.2d 968, 970 (1949). This requirement applies even where the note provides for acceleration "without notice". 49 N.M. at 117, 158 P.2d at 292. Written notice of acceleration is only one of many affirmative

acts by which the maker can be effectively informed, *see generally* Annot. 5 .A.L.R.2d 968 (1949), but if it is the only method resorted to it must reach the maker in order to be complete and effective. 209 Va. at 524, 165 S.E.2d at 391.

4. In this instance the certified letter, which otherwise would have effectively notified the Debtor that the option was exercised, never reached the Debtor. Therefore, the Note was not accelerated by this attempted communication.

5. Also, based on the evidence in the record, this Court cannot conclude that Gibraltar's other communications to the Debtor clearly and unequivocally informed the Debtor that the Note was accelerated. Although there was testimony that higher claims were made via letters and conversations between the parties, evidence was lacking as to the specific language of these communications. Furthermore, these communications occurred against a background of monthly loan billing statements which showed no acceleration. These billing statements can only mitigate the definiteness of whatever communications occurred between the parties regarding higher claims by Gibraltar.

6. Because this Court concludes the Note was not accelerated it does not reach the issue of whether the two percent increment in interest upon acceleration was a penalty.

### B. *Claims for Charges for Late Payments by Receiver on the Note*

7. Because the Court concludes the Note was not accelerated, it must now consider Gibraltar's claim for late charges on *all payments* due on the Note from the first pre-petition default on May 1, 1977. Is the five percent late charge void as penalty?

8. There are two theories by which the five percent charge might be challenged as an unenforceable penalty. First, it might be challenged as a penalty prohibited within the meaning of section 57(j) of the Bankruptcy Act. Second, it may be challenged under state law as an unenforceable

penalty term in the Note, rather than an enforceable term providing for liquidated damages.

9. Section 57(j) on its face limits the claims of federal, state, and local governments for debts owed as penalties or forfeitures to the amount of actual pecuniary loss. Section 57(j) provides:

> Debts owing to the United States or to any State or any subdivision thereof as a penalty or forfeiture shall not be allowed except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose with reasonable and actual costs occasioned thereby and such interest as may have accrued on the amount of such loss according to law.

The section is intended to protect general creditors against reduction of their dividend because of penalties or forfeitures owed by the debtor to the sovereign. 3 Collier on Bankruptcy ¶ 57.22 (14th ed. 1979).

10. Several cases, including some cited by the Receiver in opposing the present claim for late charges, find or assume without discussion that the scope of section 57(j) is sufficiently broad to prohibit late charges for payments made on an instrument where those late charges arise solely under a term in the Note. *E. g., In re Jones*, 2 Bankr. Rptr. 150, 151 (D.C.M.D.Tenn.1980) (two percent late charge on pre-petition and post-petition payments under mortgage in chapter XIII proceeding is unenforceable penalty); *Metz v. First Realty Mortgage Corp. (In re Metz)*, 1 B.R. 226, 1 Bankr.Rptr. 226, 227 (Bkrtcy.Ct.W.D.Va.1979) (three percent late charge on payments made under deed of trust note in Chapter XI proceeding is penalty and payments made thereunder are refundable); *In re Bryant*, Bankr.L.Rptr. (CCH) ¶ 64,390 (W.D.Va.Feb. 4, 1972) (to allow late charges and service charges by private claimant payments of secured note would be ironic in view of fact that section 57(j) disfavors such payments to sovereign powers).

11. A United States district court, in *Wickersham v. Alabama Steel & Wire Co.*

*(In re Southern Steel Co.)*, 183 F. 498 (N.D. Ala.1910), ruled that section 57(j) must be read to preclude pre-petition claims for penalties that are imposed by statute but which are payable to a private party rather than to the government. In *Southern Steel*, the petitioner claimed as a provable debt a state statutory penalty imposed against the bankrupt in favor of the petitioner, a private individual, for cutting trees. The court recognized that section 57(j) was intended to preserve funds for general creditors by limiting the sovereign's claim to actual pecuniary losses rather than penalties and forfeitures levied. The Court then reasoned:

> The same reasoning would apply, and with greater force, to a penalty claimed by an individual. It is not conceivable that Congress would have placed an individual in better condition than his sovereign in respect to penalty claims. The sole alternative is that penalties are not provable by individuals, at all.

*Id.* at 500.

12. The logic for bringing the facts of *Southern Steel* within the scope of the section 57(j) prohibition is compelling. Where a penalty or forfeiture is imposed by statute, it would seem to make little difference whether the proceeds accrue to the government or to a private individual as in *Southern Steel*. The underlying policy of protecting general creditors from having their eventual recovery diminished by statutorily imposed penalties applies equally in both instances. In contrast, late charges that arise under the terms of an instrument are an entirely different matter. They arise by private agreement between the parties rather than by statute. Despite some broad language in *Southern Steel*, the holding of that case does not encompass charges that arise under instruments between private parties as in the instant case.

■ 13. Even if section 57(j) were applicable to late charges arising by private agreement, it would afford nominal relief to those opposing Gibraltar's claim here. Section 57(j) prohibits only those penalty claims accruing prior to the filing of bank-

ruptcy. *Boteler v. Ingels*, 308 U.S. 57, 59–60, 521, 60 S.Ct. 29, 31, 84 L.Ed. 78 (1939). Section 57(j) does not intend to exonerate a trustee or receiver from penalties incurred in the course of operating the bankrupt's business. *Gough Industries, Inc. v. Rothman*, 446 F.2d 536 (9th Cir. 1971); *In re Los Angles Lumber Products Co.*, 45 F.Supp. 77 (S.D.Cal.1942); *The Bohack Corp. v. Consolidated Edison Company of New York, Inc. (In re Bohack)*, 2 Bankr.Ct. Dec. 1740 (E.D. N.Y. Jan. 3, 1977); 3 Collier on Bankruptcy ¶ 57.22, at 385–86 (14th ed. 1979). In the instant case only a small fraction of the late charges claimed by Gibraltar accrued prior to filing the petition.

■ 14. The Court concludes, therefore, that section 57(j) of the Bankruptcy Act does not apply to charges or penalties that arise pursuant to an agreement between private parties.

■ 15. Under the second theory, the late charge term must be scrutinized under state contract law and either upheld as a valid provision for liquidated damages or struck down as a penalty provision. Liquidated damage is a sum agreed upon by the parties, at the time the contract is entered, payable as compensation for injuries in the event of a default. A penalty, in contrast, is inserted in a contract as punishment for default rather than as a means for compensation. *See In re Lim*, Bk.No. 76–0474 (D.Hawaii Jan. 16, 1980).

■ 16. There are several requirements for upholding a provision as liquidated damages. (1) At the time the contract is made it must appear that the injury due to breach will be difficult to estimate. (2) At the time the contract is made the liquidated damage must appear to be a reasonable pre-estimate of the damage that would probably be caused by a breach. *American Financial Leasing & Services Co. v. Miller*, 41 Ohio App.2d 69, 322 N.E.2d 149 (1974); *Garrett v. Coast & Southern Federal Savings & Loan Association*, 9 Cal.3d 731, 511 P.2d 1197, 108 Cal.Rptr. 845 (1973); 5 Corbin on Contracts §§ 1059, 1060 (1964); *see* Annot., 63 A.L.R.3d 50, 57–61 (1975). (3)

Some courts also require that the contract show a conscious intention of the parties to make an advance evaluation of the damages that would flow from a breach, *e. g.*, 41 Ohio App.2d 69, 322 N.E.2d 149 (1974), but decisions show that it is the reasonableness of the sum in relation to the performance specified and the injury caused that is the controlling fact, not whether the parties intend theirs to be an agreement for liquidated damages. 5 Corbin on Contracts § 1058 (1964).

17. In assessing whether Gibraltar's claim for late charges is a penalty the Court considers both the five percent charge which is explicit in the Note and the FIFO method that Gibraltar claims applies to the Receiver's payments. These two factors in combination result in the total financial impact of late payments under the Note.

■ 18. The Court concludes that the late charge term in the Note in combination with the FIFO accounting method constitutes a penalty because it is not a reasonable pre-estimate of damages likely to result from a late payment. Those damages, under the terms of the Note, were "the additional cost of handling delinquent payments."

19. The unreasonableness of the five percent charge and FIFO accounting is apparent when its purpose is considered in relation to its operation in various situations of default. For example, if one installment is late and that default is cured before the subsequent installment is due, then a five percent charge is due on only the late payment. But if the default on the first installment is not cured before the second installment is paid, then the second installment is considered to be late and subject to a late charge, as is each regular installment thereafter. The Court has no doubt that a provision which permits a single missed installment to trigger the five percent charge for all otherwise timely subsequent payments bears no reasonable relation to expected incremental handling charges.

20. The five percent charge is a penalty even if it is considered independently of the FIFO method and the effect of that method of accounting on subsequent payments. The five percent late charge amounts to $868.50 (5% × $17,370.00 = $868.50) on any single late payment. This sum is not a reasonable pre-estimate of the higher handling costs likely to result from a single late payment. This conclusion is not inconsistent with the decision *In re Lim*, Bk.No. 76–0474 (D.Hawaii Jan. 16, 1980), which upheld a two percent late charge as applied to a monthly installment of $8,321.58. In the instant case the purported liquidated damage rate is two and one half times the rate in *Lim*, and it is applied to a base amount that is double that in *Lim*.

## C. Claims for Attorney's Fees and Costs

■ 21. Gibraltar's claim for reimbursement of its reasonable attorneys fees arises from a contract of indemnity with the Debtor. The reasonable attorneys fees are part of a debt secured by the Mortgage, and not a claim against the estate of the Debtor. *In re Lim*, Bk.No. 76–0474 (D.Hawaii Jan. 16, 1980); *Womack Lumber Co. v. Guaranty Mortgage Co. (In re Bain)*, 527 F.2d 681, 686 (6th Cir. 1976).

■ 22. Since this is not a claim against the estate, section 62 of the Bankruptcy Act and Bankruptcy Rule 219 and the standards for determining reasonableness of fees thereunder do not apply. As the Court said in *Bain* :

Such factors as "the 'economic spirit' of the Bankruptcy Act to curtail unnecessary expenses" [*In Re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir. 1958)], the benefit to the debtor's estate [*In Re Watco Corp.*, 95 F.2d 249, 252 (7th Cir. 1938), and *In Re Wellborn*, 80 F.Supp. 552, 554 (M.D.Tenn.1948)], the "conservation of the estate and the interests of creditors" [Rule 291(c)(1)] are not to be considered in determining the reasonableness of the fee. Such factors are used to *set* a reasonable fee to be paid by a bankrupt's estate. They are not applicable in reviewing a fee charged to a client by an attorney, for which an estate is responsible by way of indemnity.

In this situation, the fact that the mortgagor has filed a bankruptcy petition does not affect the reasonableness of a fee charged by an attorney to foreclose under a deed of trust which secures the payment of such fee as well as a debt. 527 F.2d at 686. The Court concludes, therefore, that the fee guidelines set down in *In re Airport Associates*, Civ.No. 79–0549 (D.Hawaii July 10, 1980) should not be controlling.

23. The Court must nevertheless determine what fees were paid by Gibraltar and whether those fees were reasonable. In *Sharp v. Hui Wahine, Inc.*, 49 Hawaii 241, 244, 413 P.2d 242, 245–46 (1966), the Hawaii Supreme Court used its own rules as a guide to reasonableness of fees. The current court rule, as amended, appears in Rules of Hawaii Supreme Court Exhibit A, Code of Professional Responsibility EC 2–18. That provision provides, in part:

> The determination of the reasonableness of a fee requires consideration of all relevant circumstances, including those stated in the Disciplinary Rules. The fees of a lawyer will vary according to many factors, including the time required, his experience, ability, and reputation, the nature of the employment, the responsibility involved, and the results obtained.

Furthermore "[a]ttorneys fees provided for by contract or by statute must be reasonable.... and must have been reasonably and necessarily incurred by the party seeking the award." *Jenkins v. Wise*, 58 Hawaii 592, 604, 574 P.2d 1337, 1345 (1978). *See also, Sharp v. Hui Wahine, Inc.*, 49 Hawaii 241, 413 P.2d 242 (1966).

24. Gibraltar carries the burden of showing the reasonableness of the fee requested by its counsel and paid for by Gibraltar. *See id.* at 247. Since Gibraltar's claim for reimbursement is not being made under Bankruptcy Rule 219, that Rule's requirement for "an application setting forth a detailed statement of (1) the services rendered and expenses incurred, (2) the amounts requested" does not apply. There must, however, be sufficient detail for Gibraltar to carry the burden of showing the expenses were reasonably and necessarily incurred.

25. Upon careful review of the timesheets supporting Gibraltar's application for reimbursement of fees of Sims & Harpole, the Court concludes the fees are reasonable.

26. Upon careful review of the timesheets supporting Gibraltar's application for reimbursement of fees of Woo, Kessner & Duca, the Court concludes the fees and costs claims are reasonable with a few exceptions, as set forth below.

27. Conference time is shown for Mr. Duca with attorney Steve Guttman on various dates. There is no indication that this work was related to the interest of Gibraltar. The Court deducts:

(a) From billing period 10/21/78—1/31/79, 1.0 hour at $75.00 per hour.

(b) From billing period 2/5/79—9/11/79, .5 hour at $80.00 per hour.

28. Time is shown on several dates for preparation of an application to hire an appraiser. The total time based on timesheets was more than 6.5 hours but less than 11.0 hours. Although the application was never filed (an appraiser was hired on application of Receiver), this work was in Gibraltar's interest. But the time spent was unreasonably long. The Court therefore deducts:

(a) From billing period 10/21/78 to 1/31/79 from timesheet of Mr. Ing, 4.0 hours at $45.00 per hour.

29. From Billing period 10/21/78—1/31/79, the Court deducts 0.5 hours at $75.00 per hour, by Mr. Duca because there is no explanation or apparent reason why a meeting with the SEC is related to Gibraltar's interests.

30. From Billing period 10/1/79—4/21/80, the Court deducts, $9.60 shown by Mr. Duca on 10/26/78 as an actual expenses for lunch in connection with a conference. Lunch for attorneys is not a reasonably necessary expense.

31. The Receiver objected strenuously to many entries of conferences and phone calls which show contact with a named individual who is directly involved the the case but which provide no further details on the purpose or subject of the contact. The Court concludes these descriptions are sufficient where, as here, the claim does not arise under bankruptcy law and the person contacted is also directly involved in the litigation. The Court makes no deductions for these entries.

32. In summary, therefore, the reasonable and necessary attorneys fees and costs which are reimburseable are as follows:

(a) Simms & Harpole, 11/27/77 to 11/5/79, $3,540.00 for fees.

(b) Woo, Kessner & Duca, for various periods:

| Billing period | Fees | Costs | Tax | Total |
|---|---|---|---|---|
| 12/09/77–01/10/78 | $ 1,612.50 | $ 32.58 | $ 64.50 | $ 1,709.58 |
| 01/11/78–04/01/78 | 4,169.75 | 199.63 | 166.79 | 4,536.17 |
| 04/03/78–06/30/78 | 4,600.25 | 492.75 | 184.01 | 5,277.01 |
| 07/06/78–10/20/78 | 478.00 | 33.70 | 19.13 | 530.58 |
| 10/21/78–01/31/79 | 2,865.00 | 64.15 | 114.60 | 3,043.75 |
| 02/05/79–09/11/79 | 6,606.00 | 109.49 | 264.24 | 6,979.73 |
| 10/01/79–04/21/80 | 4,180.50 | 117.73 | 167.22 | 4,465.45 |
| 04/21/80–01/14/81 | 1,695.00 | 90.75 | 67.80 | 1,853.55 |
| Total | $26,207.25 | 1140.28 | 1048.29 | 28,395.82 |

(c) The total of (a) and (b) above is $31,-935.82.

D. *Claims for Interest on Advances by Gibraltar*

33. The Court concludes that Gibraltar is due interest at the annual rate of 12%, for the advances it made for rent for Debtor's mortgaged premises, as provided in the terms of the Note. Interest is payable on payments of $15,403.15 and $20,591.00 for 788 and 628 days respectively for the period ending April 25, 1980. This totals $8,187.83 in interest through April 25, 1980.

34. The Court concludes that under the Note Gibraltar is similarly due interest at the annual rate of 12% for advances made to Woo, Kessner & Duca for legal fees and costs. The Court awards interest only for those fees the application claims have been paid by Gibraltar. As summarized in Finding (30) *supra*, the interest applicable through April 25, 1980 is $4,093.86.

IT IS HEREBY ORDERED that the Trustee shall disburse to Gibraltar Savings Association:

(1) The sum of $31,935.82 as reimbursement for actual attorneys fees, as shown in Conclusion (32) *supra*.

(2) The sum of $8,187.83 as interest due on advances for rent for the period ending April 25, 1980, plus additional interest at the allowable rate thereafter.

(3) The sum of $4,093.86 as interest due on advances for attorneys fees paid to Woo, Kessner & Duca for the period ending April 25, 1980, plus additional interest at the allowable rate thereafter.