**In re Michael A. ZAMANI, Debtor.**

**No. 06–52509 MM.**

United States Bankruptcy Court,
N.D. California.

April 7, 2008.

Patric J. Kelly, Adleson, Hess and Kelly, Campbell, CA, Charles B. Greene, Law Offices of Charles B. Greene, San Jose, CA, for Debtor.

Stanford H. Atwood, Jr., D. Kent Westerberg, Atwood, Haiman & Westerberg, Saratoga, CA, for Santa Clara National Bank.

**MEMORANDUM DECISION AND ORDER ON SANTA CLARA VALLEY NATIONAL BANK'S MOTION FOR AN ORDER TO DETERMINE THAT IT IS ENTITLED TO COLLECT DEFAULT INTEREST**

MARILYN MORGAN, Bankruptcy Judge.

*INTRODUCTION*

The debtor, Michael Zamani, has proposed a plan of reorganization that would

cure or pay off three promissory notes held by secured creditor Santa Clara Valley National Bank. Because the debt to the bank is over-secured, the bank is entitled to receive interest on its claims. However, the bank believes that the interest due should be calculated using the default rate of interest specified in the notes from the date of default, September 1, 2005, through the date of cure or payment. The debtor, by contrast, urges that he is only obligated to pay the basic contract, or non-default, rate of interest. After hearing arguments of counsel and reviewing the parties' submissions, the court concludes that the appropriate rate of interest is the basic contract, or non-default, rate of interest.

### *Factual Background*

On June 21, 1999, Zamani and his wife entered into the first of three loan transactions with Cupertino National Bank & Trust, the predecessor in interest to Santa Clara Valley National Bank. At that time, they borrowed $1,155,000 from the bank and executed a promissory note bearing an interest rate of 7.75%. The loan was secured by a first trust deed on property located at 1860 South Bascom Avenue in Campbell, California (Bascom Loan). In December of that same year, the Zamanis borrowed an additional $1,135,000 from the bank and signed a note with a 8.75% interest rate. This second note was secured by a first deed of trust against real property located at 4585 Stevens Creek Boulevard in Santa Clara, California (Stevens Creek Loan). The Zamanis and the bank entered into the third loan in March 2000. A promissory note in the amount of $800,000 at 8.75% interest was secured against property located at 865 The Alameda in San Jose, California (Alameda Loan).

Each of the three promissory notes are form documents that, for the most part, contain boilerplate provisions. The bank, who prepared the notes, added specific information for each loan, such as the date, the borrowers' names, the principal amount of the loan, the interest rate and the amount of the monthly payment. All three notes include a standard default provision that makes the failure to make I any payment when due an event of default. In another provision, the notes contain identical paragraphs entitled "LENDER'S RIGHTS," which state in part that,

> Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, without notice, and then Borrower will pay that amount. Upon Borrower's failure to pay all amounts declared due pursuant to this section, including failure to pay upon final maturity, Lender, at its option, may also, if permitted under applicable law, increase the interest rate on this Note 5.000 percentage points.

Each note provides that it will be governed by and construed in accordance with California law.

At the time of the Stevens Creek Loan, in December 1999, the Zamanis also executed a Business Loan Agreement (BLA) with the bank. The BLA acknowledges that the Zamanis had either received or, in the future, would apply for commercial loans from the bank, and it provides that all such loans are or would be subject to the terms and conditions of the BLA. The failure to make any payment when due on any individual loan, past or future, is a default under the BLA. In the event of default, the BLA provides that "at Lender's option, all Indebtedness immediately will become due and payable.... Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by law, all of Lender's rights and remedies shall be cu-

mulative and may be exercised singularly or concurrently."

In November 2001, the Zamanis increased the principal amount of the Bascom Loan by entering into a Change In Terms Agreement with the bank. The Change Agreement, like the original notes, is a form agreement and is very similar in appearance to the three notes. A paragraph near the top, entitled "DESCRIPTION OF CHANGE IN TERMS," states that the maturity date of the Bascom Loan is extended from June 2006 to November 2008. This paragraph further describes an interest rate change from a fixed rate to a variable rate based on the prime rate (the "index") plus 0.75%, with a floor of seven percent. Finally, it provides that $1,450,000 is the new principal amount of the loan and adjusts the monthly payment accordingly.

Unlike the original notes, the lender's rights paragraph, quoted above, is split between two paragraphs in the Change Agreement. Part of the original paragraph is on the first page of the Change Agreement in a paragraph entitled "INTEREST AFTER DEFAULT." The entire provision states that "[u]pon Borrower's failure to pay all amounts declared due pursuant to this section, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Agreement to 5.750 percentage points over the index." Then, on the second page of the Change Agreement, in a paragraph still entitled "LENDER'S RIGHTS" the Change Agreement provides that "Upon default, Lender may declare the entire unpaid principal balance on this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount." The fact that the Change Agreement relocates one sentence of the original lender's rights paragraph is not included in the paragraph that describes the changes from the original Bascom note.

Loan histories provided by the bank reflect that, over the next two years, the Zamanis made payments on all three notes; however, a number of late charges were imposed. Then, on October 30, 2003, the bank notified the Zamanis that all three loans were seriously delinquent and advised them that the bank had "the option of accelerating and declaring immediately due and payable all of the liabilities owing to the Bank." It expressly warned the Zamanis that if they did not bring the loans fully current by November 5, 2003, the bank would exercise its option to accelerate. The bank gave further notice that one "remedy the Bank intends to invoke immediately and hereby give notice of invoking is the **default interest** rate" as provided in the notes. On November 10, 2003, after the payment deadline had expired and the bank could accelerate the notes, the loan histories indicate that the bank began to charge the default interest rates on each of the three notes.

In January 2004, the Zamanis made large payments on each of the three notes. Although there is no direct evidence on this issue, the payments were apparently acceptable as a cure amount because the bank lowered the interest rate on each loan by returning to the basic contract rate. A little over a year later, on March 24, 2005, the bank notified the Zamanis that their loans were again in default because property taxes had not been paid. Separate letters for each note advised them that "under the Loan Documents, the Bank has the option of accelerating and declaring immediately due and payable all of the liabilities owing to the Bank...." The letters stated that if the default was not cured within fifteen days, "Bank will have sole discretion to effect

such action as necessary and permissible by law and by Loan Documents. . . ." Finally, the letters advised that "**NOTICE IS FURTHER GIVEN** that the Loan Documents provide the Bank, at its option with certain remedies upon default. One such remedy the Bank intends to invoke is the **default interest rate** equal to 5.00 [or, for the Bascom Note, 5.75] percentage points over the Note rate."

After receiving the March 2005 letters, the Zamanis paid their property taxes on all three properties and the bank took no farther action at that time. A few months later, however, the bank notified the Zamanis that they were in default of the monthly principal and interest payments on the three notes. Three letters, one with respect to each loan, were mailed on August 29, 2005. Like the March 2005 letters, the body of the notice provided that the bank "has the option of accelerating and declaring immediately due and payable all of the liabilities owing to the Bank under the Loan Documents." Also as in March, the bank stated that if the default was not cured within five days, "Bank will have sole discretion to effect such action as necessary and permissible by law and by Loan Documents—" The letters did not specify the amount necessary to effect a cure or what action the bank would actually take upon failure to cure within the five day grace period. Finally, the August 2005 letters contained exactly the same sentence as the March letters concerning the bank's intent to invoke the default interest rate of either 5% or, for Bascom 5.75%, over the note rate. With respect to the Bascom Loan, the default rate specified in the August 2005 letter appears to be inaccurate. The Change Agreement specifies a default rate of 5.75% over *the index,* which is only 5% over the basic contract rate, as long as the index plus 0.75% does not fall below the minimum interest rate of seven percent.

The Zamanis did not cure the defaults, and the bank's loan histories indicate that default interest rates went into effect on September 1, 2005, three days after the letters were mailed. Over a year later, on September 14, 2006, the bank recorded notices of default against each of the three properties securing the notes. Subsequently, a junior lender that held a second deed of trust against the Bascom and the Stevens Creek properties brought the bank's loans related to those two properties current as of October 24, 2006. The bank then reduced the interest rates on the Bascom and the Stevens Creek Loans back to the basic contract rate.

On December 5, 2006, Zamani filed his chapter 11 petition. In April 2007, with court approval, he consummated a sale of the Alameda property and paid the bank $737,560.51 against the Alameda Loan. This amount appears to equal the principal and non-default interest due on the Alameda Loan. The bank continues to hold a lien against the proceeds pending resolution of the dispute over the appropriate interest rate. In August 2007, the court authorized Zamani to release additional proceeds from the Alameda sale and use them to pay down the other two loans with the bank, Zamani paid the bank $67,000 against the Bascom Loan and $1,015,000 against the Stevens Creek Loan. Zamani's counsel continues to hold approximately $370,000 of the Alameda sale proceeds in his trust account.

Zamani has filed a plan of reorganization that would cure the payments defaults on each of the notes by decelerating the debt and paying all arrearages or by paying the full amount due on the note. The bank, however, has objected to the plan because it does not provide for payment of the higher default rate of interest from September 1, 2005 through to the date of

payment or cure. At the hearing on this motion, a representative of the bank indicated that the application of the default interest rate, across the three loans would make an additional $178,000 due to the bank. Papers submitted by the bank, however, suggest that the difference between the basic contract rate and the default rate may be closer to $297,000. Once the court determines what interest rate applies, the parties will submit supplemental declarations reflecting the actual amounts due.

### *Legal Discussion*

#### I. *Entz–White Dictates That The Bank Is Not Entitled To Receive The Default Rate of Interest.*

Under Bankruptcy Code § 1124(2), a claim based on a monetary default leading to acceleration of a promissory note will be unimpaired if a debtor's plan of reorganization provides for deceleration of the note and a cure of the payment defaults. To accomplish this goal, the debtor's plan must:

1. Cure any default that occurred before or after the commencement of the bankruptcy case, other than a default of a kind specified in Code § 365(b)(2) or of a kind that § 365(b)(2) expressly does not require to be cured;
2. Reinstate the maturity of such claim or interest as such maturity existed before such default;
3. Compensate the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on the acceleration provision;
4. Not otherwise alter the legal, equitable, or contractual rights to which the claim holder is entitled.

The bank contends that Zamani's plan does not satisfy the first of these requirements because it will not pay the bank the higher default rate of interest specified in the notes, which has accrued since the date of Zamani's defaults. While the Code does not address what rate of interest the debtor must pay to effect a cure within the meaning of § 1124(2)(A), the Ninth Circuit Court of Appeals has held that a debtor need not pay any contractual default rate of interest where a debtor's plan cures all payment defaults. *Great W. Bank & Trust v. Entz–White Lumber and Supply, Inc. (In re Entz–White Lumber & Supply, Inc.)*, 850 F.2d 1338 (9th Cir.1988). The court reasoned that "curing" a default returns the parties to pre-default conditions, as if the default had never occurred. Therefore, the debtor "is entitled to avoid all consequences of the default-including higher post-default interest rates." *Id.* at 1342.

Contrary to the bank's argument, the 1994 amendments to the Bankruptcy Code do not over-rule the binding precedent set forth in *Entz–White.* Early commentaries reached opposite conclusions regarding the effect of the 1994 amendments. *Compare* Grant T. Stein and Ralph S. Wheatly, *The Impact of Cure and Reinstatement on Default Interest Rates,* 16 Amer. Bankr.Inst. 1, 33 (Aug.1997)(opining that *Entz–White* has been legislatively overruled) *with* Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process,* 69 Am. Bankr. L.J. 551, 558 (Fall 1995)(the amendments appear to "codify applicable Ninth Circuit precedent that construed the Code as not requiring a default or penalty rate to be paid"). The disagreement over the effect of the amendments, in part, arises out of an ambiguity in § 365(b)(2)(D), a new provision added to the Code in 1994. Under § 1124(2)(A), a plan need not cure the kinds of defaults set forth in § 365(b)(2). Thus, following the 1994 addition of subsection (D), a plan no longer had to cure:

> (D) ... any penalty rate *or penalty* provision relating to a default arising from any failure by the debtor to perform non-monetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2)(D)(italicized word added in 2005 by BAPCPA). According to Stein and Wheatly's interpretation of this subsection, any penalty rate or any penalty provision has to arise out of a non-monetary default to be excepted from § 1124(2)'s cure requirement. Klee, on the other hand, interprets the language to mean that there is no need to cure *any* penalty rate whether arising from a monetary or non-monetary default, or any other penalty provision that relates to a nonmonetary default. The Ninth Circuit appears to agree with the interpretation advanced by Klee. Although confronted with a different issue, the circuit court in *Worthington v. General Motors Corp. (In re Claremont Acquisition Corp., Inc.)*, 113 F.3d 1029, 1034 (9th Cir.1997), indicated that, logically, § 365(b)(2)(D) should be read as "the satisfaction of any penalty rate or [*the satisfaction of any penalty* ] provision relating to a default arising from any failure of the Debtor to perform non-monetary obligations." (italics and brackets in original). This construction indicates that no penalty interest rates, whether arising out of a monetary or non-monetary default, need to be satisfied for purposes of a cure under § 1124(2).

■ Section 1123(d), another 1994 addition to the Code, does not lead to a different result. This section provides that,

> (d) Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law.

11 U.S.C. § 1123(d). This provision has caused some confusion because it directs courts to look to the underlying contract and to non-bankruptcy law to determine the amount needed to cure a default. The bank argues that this legislative directive, clearly overrules *Entz–White* and, where a default has occurred, requires the use of any contractually agreed upon default interest rate to calculate the cure amount. I disagree for several reasons.

First, no Ninth Circuit case has suggested that the enactment of § 1123(d) legislatively overruled *Entz–White.* To the contrary, a 2002 decision of the Ninth Circuit specifically referenced *Entz–White* in finding that an over-secured creditor had no standing to complain when it was receiving its standard contractual rate of interest. *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1075–76 (9 th Cir.2002). The bank incorrectly urges that a 2000 decision of the Ninth Circuit recognizes that the 1994 amendments have called the *Entz–White* precedent into doubt. The *Hassen Imports* case cited by the bank is a bankruptcy appellate panel case, not a Ninth Circuit decision. *See In re Hassen Imports Partnership,* 256 B.R. 916, 924 n. 13 (9th Cir. BAP 2000). More importantly, however, its brief mention of *Entz–White* is dicta. *Id.* at 924 (recognizing that *Entz–White* was not controlling because Hassen Import's plan did not cure the default). Meanwhile, another post–1994 appellate panel decision that confronted *Entz–White* more directly found that a bankruptcy court correctly followed *Entz–White* when it denied an over-secured creditor's claim for default interest. *See In re Udhus,* 218 B.R. 513, 518 (9th Cir. BAP 1998).

Second, after detailed consideration of the legislative history, a bankruptcy court in Arizona recently found that § 1123(d) does not require the application of a contractual post-default interest rate. *In re*

*Phoenix Business Park Ltd. Partnership,* 257 B.R. 517, 521–22 (Bankr.D.Ariz.2001). The court reasoned that the legislative intent behind the enactment of § 1123(d) was a pro-debtor intent to preclude creditors from demanding payment of interest on interest to cure a loan default; it was not enacted to promote or endorse the imposition of default interest rates. In fact, as the court pointed out, the legislative history expressly indicates that, in enacting § 1123(d), it was "the [House] Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." *Id.* at 522, *quoting,* H.R.Rep. No. 103–835, at 55 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3364. This is exactly the reason that the Ninth Circuit in *Entz–White* determined that default interest is inappropriate when a plan effects a complete cure. In light of this history, the *Phoenix Business Park* court concluded that *Entz–White* remains good law in the Ninth Circuit and that a debtor "need pay interest only at the contract rate, not the default rate, and need not pay late charges to effectuate a cure under section 1124(2)." *Phoenix Business Park,* 257 B.R. at 522. Just last year, a bankruptcy court in Colorado agreed with *Phoenix Business Park's* analysis of the 1994 amendments and their legislative history. *See In re Sweet,* 369 B.R. 644 (Bankr.D.Colo.2007). While the *Sweet* court ultimately allowed the lender in that case to collect the contractual default rate, the court's decision was not controlled by *Entz–White* and the court concluded that the default rate being charged did not constitute a "penalty rate" within the meaning of § 365(b)(2)(D).

Finally, the contract before me contains no provision that specifically addresses how to cure a default or how to calculate the cure amount. The contract merely provides for a default rate of interest as one of the lender's optional rights that arises upon an event of default. Because there is no contractual provision requiring the use of the higher default interest rate *for purposes of calculating a cure amount,* looking to the underlying contract as directed by § 1123(d)does not, in this case, prohibit the debtor's use of the basic contract rate of interest in curing his debt.

### II. *Even Absent Entz–White. The Bank Failed To Present Sufficient Evidence Of Reasonableness To Entitle It To Default Interest.*

Relying on authority from other jurisdictions, the bank inaccurately argues that, because *Entz–White* is not controlling, there is a presumption in favor of allowing interest at the contractual default rate as long as the rate is enforceable under non-bankruptcy law. In fact, courts not bound by *Entz–White* have followed diverse approaches to determine when a contractual default interest rate should be allowed. Some courts have relied on the contractual default rate of interest and have refused to perform a reasonableness analysis unless the default rate qualifies as usurious or unconscionable. *See e.g., In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Cal.1987); *In re Consolidated Operating Partners, LP,* 91 B.R. 113 (Bankr.D.Colo.1988). Other courts, as argued by the bank, recognize a presumption in favor of a contractual default rate of interest that is subject to rebuttal based on countervailing equitable considerations. *See e.g., Southland Corp. v. Toronto–Dominion (In re Southland),* 160 F.3d 1054 (5th Cir.1998);' *In re Terry Ltd. Ptnrshp.,* 27 F.3d 241 (7th Cir. 1994).

The Ninth Circuit has not specifically addressed the issue in the *non-Entz–White* context; e.g., where the plan does not provide for a complete cure. Howev-

er, our bankruptcy appellate panel has confronted it and has adopted a third approach that requires the creditor to demonstrate the reasonableness and the compensatory nature of the default interest rate before the creditor will be allowed to collect interest at the higher default rate. *In re Yett,* 306 B.R. 287 (9th Cir. BAP2004); *Hassen Imports,* 256 B.R. at 924; *In re Casa Blanca Project Lenders,* 196 B.R. 140 (9th Cir. BAP 1996). While recognizing that a secured creditor is entitled to compensation for losses, the bankruptcy appellate panel has concluded that an interest rate providing more than appropriate compensation is a penalty against the debtor and should not be allowed. *Casa Blanca,* 196 B.R. at 146–47. As a result, it is not enough for a creditor to show that the default rate of interest is within a generally accepted range of interest rates. Rather, the creditor must provide tangible proof of loss; "formulaic or hypothetical" statements are insufficient. *Id.* at 147. If the creditor fails to satisfy this evidentiary burden, the court will only allow the basic contract rate of interest. *Yett,* 306 B.R. at 294–95; *Hassen Imports,* 256 B.R. at 924; *Casa Blanca,* 196 B.R. at 146–47.

Here, the only evidence supporting the asserted default interest rate is the language of the three notes, each of which charge a default rate of five percent over the basic contract rate. At argument, counsel for the bank conceded that nothing in the record shows how the bank chose the default interest rate. Nevertheless, counsel asserted that he believed the default interest rate to be typical within the industry and argued that Zamani could have refused to sign the notes if the rate was unacceptable. This evidence, or lack thereof, utterly fails to establish the compensatory nature of the default interest rate as required by the *Casa Blanca* line of cases. To the contrary, the bank's motion papers, state that "[t]he default interest rates were options made available to [the bank] to assure repayment of the loans upon maturity where Debtor defaulted and failed to cure and pay other late charges." Default rates that are meant to be an enforcement mechanism, as the bank represents, go beyond compensation and are unacceptable penalties. *Casa Blanca,* 196 B.R. at 147; *See also Timberline Property Development, Inc.,* 136 B.R. 382 (Bankr.D.N.J.1992). Thus, even if *Entz–White* were not controlling, the bank has not satisfied its burden of establishing the compensatory nature of the default interest rate. As a result, it is not entitled to receive interest at the default rate.

### III. *The Loan Documents Require Acceleration Before The Default Interest Rate May Be Invoked.*

In light of the above conclusions, Zamani's remaining arguments that 1) the bank was not entitled to invoke the default rate of interest until after it gave Zamani clear and unequivocal notice that it was exercising its right to accelerate the notes; and, 2) the default interest rate is a disguised and unreasonable liquidated damages provision are not germane to the court's ruling. Nevertheless, it is worth noting that the "Lender's Rights" provision in each of three notes states that the bank has the option to increase the interest rate *after* Zamani "fails to pay all amounts *declared due pursuant to this section,* including failure to pay upon final maturity." The only amounts that the bank can "declare due" under that section are the entire unpaid principal and interest due upon acceleration or final maturity. As a result, under the plain language of the notes, the bank's right to invoke the default interest rate did not exist unless and until it accelerated the notes and Zamani failed to pay the entire accelerated

amount. It makes no difference that the December 1999 BLA states that the bank's rights upon default can be exercised "singularly or concurrently." Because the contractual right to increase the interest rate was nonexistent until after Zamani failed to pay following a declared acceleration, there is no right, or option, to exercise either "singularly or concurrently" until after acceleration of the note.

I am also not persuaded that the 2000 Change Agreement affects the outcome with respect to the Bascom Loan. Although the Change Agreement split the "Lender's Rights" language into two paragraphs, it is apparent that neither party considered this formatting change to be a material change in the terms of the loan. If they had, the change should have been included in the paragraph entitled "Description of Change in Terms." In the Change Agreement, the imposition of the default rate of interest is still dependent on Zamani's failure to pay "all amounts *declared due pursuant to this section,* including failure to pay upon final maturity." Because the section no longer provides for any amounts to be declared due, it can only be understood as continuing to refer to the lender's right to accelerate the note.

■ The Ninth Circuit has held that where the ability to invoke a default rate of interest is inextricably bound up with acceleration, proper notice of acceleration must take place before the interest rate can be increased. *In re Crystal Properties,* 268 F.3d 743 (9th Cir.2001). Under both federal and California law, proper notice requires clear and unequivocal notice to borrowers that the lender is exercising its right to accelerate the amounts due under a note. *Crystal Properties,* 268 F.3d at 749; *In re Holiday Mart, Inc.,* 9 B.R. 99, 105 (D.Hawai'i 1981)(notice must effectively informs the maker that the option to accelerate has been exercised). This notice is required even where loan documents provide that acceleration can occur "with or without notice." *Crystal Properties,* 268 F.3d at 749; *Holiday Mart,* 9 B.R. at 105.

In *Crystal Properties,* the loan documents gave the lender the option to accelerate the debt and "thereafter" the option to charge default interest. In light of the contractual requirement to accelerate before invoking the default rate of interest, the Ninth Circuit concluded that the lender had to take affirmative action to clearly and unequivocally notify the debtor that it intended to accelerate the notes before default interest could accrue. Because the debtor never received the required notice, the lender there was only entitled to receive the basic contract rate of interest.

■ The record before me, as in *Crystal Properties,* fails to establish that, in August 2005, the bank clearly and unequivocally notified Zamani that it was exercising its right to accelerate the notes. The August 29, 2005 letters to Zamani merely provide that, due to Zamani's default, the bank "has the option of accelerating and declaring immediately due and payable all of the liabilities owing to the Bank." Although the letters demand that the default be cured within five days, the bank did not specify the amount necessary to effect a cure or what action the bank would actually take upon failure to cure. The letters state only that "Bank will have sole discretion to effect such action as necessary and permissible by law and by Loan Documents...." That the bank knew that it needed to accelerate the notes prior to invoking the default rate of interest and knew how to accelerate the notes properly is apparent from an earlier default notice to Zamani. In October 2003, the bank advised Zamani that if Zamani did not bring the loans fully current by November 5, 2003, the bank "would exercise its option

to accelerate." The bank further warned that "the Bank intends to invoke immediately and hereby gives notice of invoking the **default interest** rate." Unlike the August 2005 letters, the October 2003 notice specifically advised Zamani that the bank would exercise its option, not merely that it had the option. Moreover, despite notice that it was immediately invoking the default interest rate, it did not do so until November 10, 2003, after acceleration occurred. The bank simply failed to follow a similar procedure in August 2005. That procedural failure is also fatal to the bank's request to recover interest at the default rate.

### *Conclusion*

For the reasons explained, Santa Clara Valley National Bank's Motion For Order Confirming That It Is Entitled To Collect Default Interest is denied.

Good cause appearing, IT IS SO ORDERED.