## In re PHOENIX BUSINESS PARK LIMITED PARTNERSHIP, Debtor.

### No. B–99–05357–ECF–CGC.

United States Bankruptcy Court, D. Arizona.

Jan. 12, 2001.

Sean O'Brien, Gust Rosenfeld PLC, Phoenix, AZ, for Morris Reznik and Honeylou C. Reznik Trust.

Lawrence D. Hirsch, Hirsch Law Office, P.C., Phoenix, AZ, former attorneys for debtor.

## UNDER ADVISEMENT DECISION RE: PLAN CONFIRMATION

CHARLES G. CASE, II, Bankruptcy Judge.

### I. Introduction

Debtor Phoenix Business Park Limited Partnership ("Debtor") filed a Reorganization Plan in August of 1999, which it subsequently modified in September of 1999. In June, 2000, Debtor then filed what it titled its "First Chapter 11 Plan" ("Plan"). It is this Plan to which The Morris Reznik and Honeylou C. Reznik Trust dated January 20, 1965 (the "Trust") objects. The Trust's complaint is that the Plan fails to cure Debtor's default and provide for the full amount of the Trust's secured claim. The Court agrees in part with the Trust's argument but also disagrees in part. As a result, confirmation of the Debtor's Plan is denied without prejudice to filing a new Plan consistent with this decision.

### II. Factual Background

The Trust is the first priority lienholder pursuant to a Note and Deed of Trust it acquired from G. Wade Bonine, Inc.[1] The Note provides that all payments Debtor makes will be applied as follows: (i) the payment of any costs, fees or other charges; (ii) the payment of accrued interest at the contract rate of 10.75%; and (iii) the reduction of the principal balance. In the event of default, default interest will accrue at the rate of 24% per annum plus late charges of $1,056 and reasonable attorneys' fees and collection fees. The Note is secured by a deed of trust, assignment of rents and security agreement encumbering a commercial business park in Phoenix, Arizona. The regular monthly mortgage payment, assuming no default, is $15,464.33, comprised of principal and interest of $10,559.33, collection fees of $15.00 and real property tax impound of $4,890.[2]

Debtor filed under Chapter 11 on May 10, 1999, and is a single asset real estate entity pursuant to 11 U.S.C. section 101(51)(A). The Trust's claim is oversecured. The only other lien on the property is for delinquent real estate taxes of $8,407.85.

Under Debtor's Plan, the Trust's claim is classified in Class 2–B as an impaired claim.[3] The Plan proposes to treat the Trust's Class 2–B claim as follows:

> The Debtor will cure all arrearages due under the obligation prior to the Effective Date by making a cash payment equal to the number of monthly payments in arrears times the regular monthly payment (not including default interest) less any payments already received pursuant to the Court's order regarding modification of the Automatic Stay.

The Trust objects to its treatment under the Plan, in particular Debtor's attempt to avoid all consequences of its default, including the payment of default interest as called for under the Note. In addition, the Trust objects to Debtor's attempt in June, 2000, to reinstate the loan by tendering to the Trust a check in the amount of $78,477.

---

1. G. Wade Bonine, Inc. had become the lawful owner and holder for value by assignment or amendment from Mortgages, Ltd., the original holder of the Note and Deed of Trust, sometime in early 1999.

2. Debtor asserts that the Note only requires payment of principal and interest and therefore the impound amounts are not part of the "cure." However, paragraph 7 of the Deed of Trust does require real estate impounds to be paid and therefore such amounts are part of the "regular monthly payments" that should be included in any cure.

3. At the hearing, Debtor's counsel acknowledged that the real intent of the Plan was to "unimpair" the Trust's claim under 11 U.S.C. § 1124(2)(A) by curing the existing defaults as permitted by 11 U.S.C. § 1123(a)(5)(G). Therefore, the Trust's claim is in fact treated as unimpaired.

The Trust states it returned the check to Debtor because the amount was insufficient to reinstate the loan due to Debtor's improper calculation of the monthly mortgage payment.

## III. Analysis

### A. Introduction

All parties acknowledge that the Code permits a debtor to cure a default pursuant to a confirmed plan of reorganization in order to avoid the consequences of the default. 11 U.S.C. § 1123(a)(5)(G).[4] The question is what must Debtor pay in order to cure the default so that the creditor will be unimpaired pursuant to section 1124.[5] Is it enough to cure past due payments at the contract interest rate, or is the Debtor obligated to pay principal, interest at the default rate, late charges, and other related default costs such as attorneys' fees and costs?

Debtor's Plan proposes to make a cash payment equal to the number of monthly payments in arrears times the regular monthly payment less any payments Debtor made during the bankruptcy. The Trust argues that this is insufficient and that in order to cure the default and leave it unimpaired, Debtor must pay the total monthly payments in default at the default interest rate provided for in the Note plus all late charges and reasonable attorneys' fees and collection costs.

### B. The Appropriate Interest Rate
#### 1. Ninth Circuit Law

▮ In 1988, the Ninth Circuit decided *In re Entz–White Lumber and Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988). There, the debtor sought to "cure" a defaulted-and matured-loan by paying off the entire principal due, together with interest at the non-default rate. The creditor objected, arguing that it was entitled to default interest.

The Court cited the seminal case on cure, *In re Taddeo*, 685 F.2d 24 (2d Cir. 1982), for the proposition that, while undefined by the Code itself, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." 850 F.2d at 1340. Although *Taddeo* was a Chapter 13 case, Judge Lifland of the Southern District of New York adopted the *Taddeo* standard in a trilogy of Chapter 11 cases in the mid–1980's,[6] which have formed the basis of much of the section 1124(2) jurisprudence to this date. *See* 1985 Ann.Surv.Bankr.L. 675–84 (William L. Norton, Jr. ed.) ("Norton"). In those cases, Judge Lifland held, among other

---

4. Section 1123(a)(5)(G) provides that

    (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
    \*\*\*
    (5) provide adequate means for the plan's implementation, such as—
    \*\*\*
    (G) curing or waiving of any default.

5. Like section 1123(a)(5)(G), section 1124 describes, but does not define, what it means to cure a default:

    Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
    \*\*\*
    (2) notwithstanding any contractual provision or applicable law that entitles the hold-

er of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

    (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title.
    \*\*\*
    (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law. . . .

6. *In re Forest Hills Associates*, 40 B.R. 410 (Bankr.S.D.N.Y.1984); *In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr.S.D.N.Y. 1984); and *In re Kizzac Management Corp.*, 44 B.R. 496 (Bankr.S.D.N.Y.1984).

things, that a debtor may cure a default, and "de-accelerate" a loan, by paying interest at the contract rate.

The *Entz–White* Court adopted the reasoning of these cases, noting:

> [B]y curing the default, Entz–White is entitled to avoid all consequences of the default—including higher post-default interest rates. This result is consistent with the treatment by other courts of the Bankruptcy Code's cure provisions.

850 F.2d at 1342. The Ninth Circuit has uniformly followed the *Entz–White* interpretation of "cure" since 1988 and it remains the law of the circuit today. *See In re Southeast Company,* 868 F.2d 335 (9th Cir.1989); *In re Udhus,* 218 B.R. 513 (9th Cir. BAP 1998); *In re Casa Blanca Project Lenders, L.P.,* 196 B.R. 140 (9th Cir. BAP 1996).

### 2. The 1994 Amendments to the Bankruptcy Code

The Trust has little quarrel with this statement of Ninth Circuit case law. Its argument is that Congress legislatively overruled *Entz–White* and its progeny with the Bankruptcy Reform Act of 1994's addition of a new section 1123(d). Section 1123(d) provides that

> [n]otwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default, shall be determined in accordance with the *underlying agreement and applicable non-bankruptcy law.*

(Emphasis added). Prior to section 1123(d), the Code had no statutory language relating to the amount required to cure a default pursuant to a plan of reorganization; section 1123(a)(5)(G) permitted a cure or waiver of a default pursuant to a plan of reorganization but did not provide any definition of cure or any statutory guidance as to the amount required to cure the default.

The Trust argues that section 1123(d) is unambiguous and concretely requires that default interest, if provided under an agreement and not prohibited by applicable law, must be paid as part of a section 1124(2) cure, notwithstanding prior judicial determinations to the contrary. The Trust notes that a number of commentators have come to the same conclusion. Grant T. Stein and Ralph S. Wheatly, *The Impact of Cure and Reinstatement on Default Interest,* 16 Amer.Bankr.Inst. 1, 33 (Aug.1997) ("Under § 1123(d), the amount necessary to cure a default is to be determined in accordance with the underlying agreement and applicable non-bankruptcy law. Thus, in determining the amount necessary to effect a cure, the interest entitlement should be determined by the terms of the underlying contract, including the application of the default interest rate provided for therein."); Thomas J. Salerno, Craig D. Hansen and G. Christopher Meyer, 2 Adv. Chapter 11 Bankr.Practice § 10.79, 176 (John Wiley & Sons, Inc. 2nd ed.1996) ("[S]ection 1123(d) effectively overrules *In re Entz–White.*").

■ In construing legislative changes to the Code, it is important to harmonize all changes made at the same time that affect the same Code sections. Here, Congress also made changes in 1994 to section 365(b)(2). That section deals with certain enumerated kinds of default that need not be cured as part of the assumption of an executory contract. Its relevance to this case derives from the provision in section 1124(2)(A) that defaults of the kind specified in section 365(b)(2) *need not be cured* in order for a claim to be "unimpaired" under section 1124.

Prior to the changes in 1994, the defaults enumerated in section 365(b)(2) were all of a traditional *ipso facto* variety; *i.e.* insolvency, filing a bankruptcy case, or having assets taken over by a custodian. However, the 1994 amendments also added the following language as new section 365(b)(2)(D):

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

Applying this language to section 1124(2), the result appears to be that a debtor need not satisfy a penalty rate *or* a provision relating to a nonmonetary default in order to effect a "cure" and leave a creditor unimpaired. Thus, if a default interest rate is a "penalty rate," then it does not need to be paid as part of a section 1124(2) cure. Here, the Court has little difficulty concluding that a default rate of 24%— against a contract rate of 10.75%—as well as monthly late charges of $1,056.00, should be construed as "penalty rate[s]" within the meaning of this statute.

At least one commentator has argued that this language means that a "penalty rate" need not be paid *only if* it arises out of a nonmonetary default and that, by negative implication, if the penalty rate is triggered by a payment failure, as here, the exculpatory language is not applicable. *See* Stern and Wheatly, *supra.* While this argument may succeed elsewhere, it is unavailable, even if correct, in the Ninth Circuit.[7] In *Worthington v. General Motors Corp. (In re Claremont Acquisition Corp. Inc.)*, 113 F.3d 1029 (9th Cir.1997), the court of appeals construed this precise language (in a section 365 case) and concluded that each of the two clauses of section 365(b)(2)(D) independently refers to penalties of different sorts, the first, a penalty rate and the second, a penalty provision.[8] The court did not suggest in any way that the secondary modifier ("relating to a default arising from any failure of the Debtor to perform nonmonetary obligations") also modified the first clause ("penalty rate"). Therefore, the incorporation of new section 365(b)(2)(D), as interpreted by the Ninth Circuit, into section 1124(2)(A) squarely suggests a congressional intent directly contrary to the Trust's interpretation of section 1123(d), a section added at exactly the same time.

▮ Under these circumstances, it is both appropriate and necessary to examine the legislative history of these changes to determine if the apparent conflict between these statutory provisions can be resolved. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978); *Brooks v. Donovan,* 699 F.2d 1010, 1011 (9th Cir.1983).

The congressionally expressed purpose of section 1123(d) was to prevent what Congress perceived as a windfall to creditors resulting from the United States Supreme Court's decision in *Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). According to the House Report, section 1123(d) would stop creditors from receiving interest on mortgage arrearages paid by debtors in their attempts to cure the defaults on their mortgages. This limited and prescriptive purpose is supported by the fact that the language that became section 1123(d) was included as section 305 (entitled "Interest on Inter-

---

7. The correctness of this analysis is by no means a given. Another leading commentator argues precisely the opposite result from the same language. *See* Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process,* 69 Am.Bankr.L.J. 551, 558 (Fall 1995) ("Most significantly, this provision [§ 365(b)(2)(D)] applies to the definition of impairment and reversal of acceleration of an obligation in Chapter 11. Section 1124(2)(A) incorporates § 365(b)(2), thereby permitting reversal of acceleration and cure of default at non-penalty rates. Thus, the congressional amendment appears to codify applicable Ninth Circuit precedent that construed the Code as not requiring a default or penalty rate to be paid when a plan reversed the acceleration and reinstated the terms of an obligation.").

8. The Court suggested the following as the correct reading of the statute: "Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—(D) the satisfaction of any penalty rate or [the satisfaction of any penalty] provision relating to a default arising from any failure of the Debtor to perform nonmonetary obligations under an executory contract of unexpired lease."

est") in Title III of Reform Act—that portion of the statute addressing issues in *consumer* bankruptcy cases as opposed to Title II, the portion of the statute addressing issues in *commercial* bankruptcy cases.[9] Further, the identical language was included in Chapter 13 as new section 1322(e), again suggesting that its focus was consumer cases. Finally, because of the conflict between sections 365(b)(5)(D) and 1124(2)(A), one would expect the limiting preliminary language of section 1123(d)[10] to include reference to one or both of those sections to make clear Congress' intent, if that intent was to overrule, rather than codify, the *Entz–White* line of cases. No such reference exists.

The foregoing analysis compels the conclusion that Congress did not legislatively overrule *Entz–White*, that *Entz–White* remains good law in the Ninth Circuit and that, therefore, a debtor need pay interest only at the contract rate, and not the default rate, and need not pay late charges in order to effectuate a cure under section 1124(2).

### C. Other charges

■ The analysis does not end with the resolution of default interest and late charges. There are essentially two remaining categories of charges and fees that may be owed by the Debtor—those owed pursuant to section 1124(2)(C)(3) and those owed pursuant to section 506(b). Section 1124(2)(C)(3) provides that

[e]xcept as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan

\*\*\*

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

\*\*\*

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law.

This section entitles the Trust to be compensated for damages incurred in reliance upon the Note's acceleration clause and attendant efforts to enforce its rights as a result of such acceleration, such as the commencement of a trustee's sale of the property. These damages must be paid as part of the cure. The costs must be reasonable and also be the direct result of acceleration and not in any manner a penalty arising from the default itself, which this Court

9. The full legislative history of Section 1123(d) reads as follows:

TITLE III. CONSUMER BANKRUPTCY ISSUES

Section 305. Interest on interest.

This section will have the effect of overruling the decision of the Supreme Court in Rake v. Wade, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). In that case, the Court held that the Bankruptcy Code required that interest be paid on mortgage arrearages paid by debtors curing defaults on their mortgages. Notwithstanding State law, this case has had the effect of providing a windfall to secured creditors at the expense of unsecured creditors by forcing debtors to pay the bulk of their income to satisfy the secured creditors' claims. This had the effect of giving secured creditors interest on interest payments, and interest on the late charges and other fees,

even where applicable law prohibits such interest and even when it was something that was not contemplated by either party in the original transaction. This provision will be applicable prospectively only, i.e., it will be applicable to all future contracts, including transactions that refinance existing contracts. It will limit the secured creditor to the benefit of the initial bargain with no court contrived windfall. It is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred.

140 Cong.Rec.H. 10770 (October 4, 1994).

10. "Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7) and 1129(b)...."

has already concluded are not owed in order to cure the default. The logic behind § 1124(2)(C) is to protect an accelerating creditor from out-of-pocket losses incurred when a debtor files bankruptcy and undoes the acceleration. Thus, to be compensable, the damage should arise from damages incurred as a result of actions taken in reliance upon the existence of an acceleration clause (such as legal fees, foreclosure notice fees, court costs, and the like) not merely upon the existence of a contractual right to some remedy, such as compound interest.

Norton, *supra,* at 681.

In addition, section 506(b) provides that the Trust, as the holder of an oversecured claim, is entitled to "any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." These fees and costs, however, need not be paid immediately, but may be added to the principal on the Note and paid over time with payment on the Note. *See Florida Partners Corp. v. Southeast Co. (In re Southeast Co.),* 868 F.2d 335, 339 (9th Cir.1989).

## IV. Conclusion

Based on the foregoing analysis, Debtor's Plan of Reorganization is denied without prejudice to the submission of a new plan. To that end, Debtor must file an application to employ counsel within thirty days (30) of the date of this decision.[11] Debtor will then have an additional thirty days (30) from the date of an order approving Debtor's employment of counsel to file a new plan of reorganization in accordance with this ruling. Debtor is directed to immediately thereafter request a continued confirmation hearing on the newly submitted plan.

With respect to the awards of fees and costs under sections 1124(C)(3) and 506(b), further information is needed from the Trust to determine the amounts to be awarded. A review of the Trust's various

charges and/or fees comprising the "purchase price" does little to help the Court determine which charges are those related directly to the Trust's reliance on its acceleration right as opposed to those charges falling under section 506(b) or those more appropriately deemed penalties. Therefore, within fifteen days (15) of the date of this decision, the Trust must file an application specifying what fees and damages it believes it incurred directly as a result of the acceleration clause, with an explanation of how the damages resulted from the enforcement of the acceleration clause. In addition, the Trust shall also specify those reasonable fees and costs it believes it is entitled to under section 506(b) and the Note and Deed of Trust.

So ordered.

---

11. Counsel who argued this matter has since withdrawn.