**In re Richard C. SWEET, Jennifer L. Sweet, Debtors.**

**No. 03–24752 MER.**

United States Bankruptcy Court, D. Colorado.

May 21, 2007.

**646**

Dan S. Hughes, Colorado Springs, CO, William A. Richey, Darrell G. Waas, Jeffrey Weinman, Denver, CO, for Debtors.

## ORDER

MICHAEL E. ROMERO, Bankruptcy Judge.

THIS MATTER comes before the Court on the challenge by the Debtors, Richard and Jennifer Sweet (collectively the "Debtors") to the proof of claim filed by Joseph Pollack ("Pollack"). The Court has reviewed the testimony, the arguments of counsel and the legal authority cited by each party and makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b) and 28 U.S.C. § 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (K), as it involves the allowance or disallowance of claims against the estate and the determination of the validity, extent, or priority of a lien.[1]

## BACKGROUND FACTS[2]

On March 1, 1999, the Debtors and First Community Industrial Bank entered into a

---

1. Additionally, in its Order Confirming Second Amended Plan of Reorganization Dated April 14, 2005 as Modified, the Court, pursuant to the parties' requests, retained jurisdiction of this matter, *"inter alia,* to determine the extent, priority and validity of the lien of SN Servicing held by Joseph Pollack."

2. In connection with the hearing the parties filed a document titled Stipulations for the

Variable Rate Commercial Promissory Note (the "Note") in the original amount of $408,195. *See Stipulation ¶ 1; Pollack Exhibit A.* The terms of the Note provided the Debtors would make 359 payments of $3,814.11, beginning April 1, 1999 and continuing through March 1, 2029. The Note bore a minimum interest rate of 8.75% and a maximum interest rate of 16.75% and additionally provided for a default interest rate of 21%. The Note is secured by a deed of trust (the "Deed of Trust") on a 36–acre tract of land owned by the Debtors and located adjacent to real property owned by Pollack. *See Stipulation ¶ 2; Pollack Exhibit D.* The Note was subsequently transferred to SN Servicing Corporation ("Servicing").

On April 14, 2005, the Debtors filed their Second Amended Disclosure Statement and Second Amended Plan of Reorganization (the "Plan"). Approximately five months later, Servicing transferred the Note to Pollack, after which Pollack filed his objection to the confirmation of the Plan.

Thereafter, the Debtors filed two preconfirmation modifications to the Plan. The first modification changed the status of Pollack's claim from an impaired secured claim to an unimpaired secured claim and provided the claim would be paid in full.[3] The second modification was filed with the Court the day prior to the confirmation hearing and changed the effective date of the Plan to ninety days after the confirmation order became a final Order. Neither of the modifications resolved Pollack's objections.

On February 1, 2006, Pollack agreed to withdraw his objection and allow confirmation to occur, provided the Debtors agreed to a subsequent hearing concerning the value of his claim. Accordingly, the Court entered an Order confirming the Debtors' Plan and set a post-confirmation hearing consistent with the parties' agreement. On February 24, 2006, the Court held the hearing on Pollack's claim.

## DISCUSSION

### 1. Entz–White and § 1123(d)

Generally, under the law of contracts, a party in breach or default of its contractual obligations does not have the right to rectify or cure its breach or default absent an express contractual provision permitting it to do so.[4] In Chapter 11 bankruptcy cases, however, debtors are authorized by statute to cure contractual defaults as one of several permissive steps

Hearing on February 24, 2006 (the "Stipulation") which form the basis of numerous facts noted herein. Additionally, the parties stipulated to the admission of Pollack Exhibits A, D, G and I, as well as Debtors' Exhibits 1, 2, 3, 5, 6, 9, 10 and 11. All other exhibits were withdrawn.

3. The modified Plan language relevant to this dispute states:

> Class 8 consists of the allowed secured claim of Joseph Pollack, assignee of SN Servicing Corporation, secured by 36 acres of land located at 16795 Remington Road, Colorado Springs, Colorado. Class 8 is not impaired under the Plan. . . .
> The unimpaired secured claim of the Class 8 creditor under Article III of the Plan shall provide as follows: The allowed secured claim of the Class 8 creditor shall be paid by the cure and deceleration of any default under the promissory note and payment in full of such amount plus any amount which the Class 8 creditor may be entitled to as damages under 11 U.S.C. § 1124(2) on the Effective Date of the Plan. To the extent that the Debtors and the Class 8 creditor dispute any such amounts, such amounts shall be determined by the Court. . . .

*Modifications to Second Amended Plan of Reorganization Dated April 14, 2005*, pp. 1–2, Articles II and IV (the "Modification").

4. Epling, *Contractual Cure in Bankruptcy*, 61 Am. Bankr.L.J. 71 (Winter 1987).

toward achieving plan confirmation.[5] Specifically, 11 U.S.C. § 1123(a)(5)(G)[6] states a proposed plan of reorganization shall provide adequate means for its implementation, such as the curing of any default. In this case, the crux of the dispute relates to whether Pollack is entitled to claim default interest, attorney's fees and late charges as part of the cure of the Note default.

■ The Debtors take the position that if a default is cured as part of a plan of reorganization, a debtor only has to pay interest on the outstanding obligation at the pre-default interest rate. In support of this argument, the Debtors rely on the holding of *Great W. Bank & Trust v. Entz–White Lumber & Supply (Entz–White)*, 850 F.2d 1338 (9th Cir.1988). Pollack argues this holding is no longer valid as a result of the passage of the Bankruptcy Reform Act of 1994, which, in part, added a new provision dealing with "cures," § 1123(d). Thus, any analysis must begin with a brief examination of the interplay between *Entz–White* and § 1123(d).

In *Entz–White*, the debtor entered into a promissory note with Great Western Bank & Trust. The promissory note provided for interest at the prime rate plus 1.5%. The promissory note also provided a default rate of interest at 150% of the contract interest rate or 18%, whichever

was greater. The promissory note matured without the debtor making full payment and instead the debtor filed for Chapter 11 bankruptcy. Thereafter, the debtor filed its plan of reorganization which provided that pursuant to § 1124(2)[7] the bank's claim was unimpaired as the bank was to be paid the principal amount of the loan and the non-default interest rate of prime plus 1.5%. The bank objected and argued it was entitled to the 18% default rate which increased the amount owed on the promissory note approximately $190,000.

As part of its deliberations, the Ninth Circuit Court of Appeals referred to the then seminal case on cure, *In re Taddeo*, 685 F.2d 24 (2nd Cir.1982), for the proposition that while undefined by the Bankruptcy Code itself, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *Entz–White*, 850 F.2d at 1340 *quoting Taddeo*, 685 F.2d at 26–27. The *Entz–White* Court then held:

[B]y curing the default, Entz–White is entitled to avoid all consequences of the default-including higher post-default interest rates. This result is consistent

---

5. Cure rights also exist in cases filed under Chapters 12 and 13 of the Bankruptcy Code.

6. Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

7. Section 1124(2) states in relevant part:
   [A] class of claims or interests is impaired under a plan, unless, with respect to each claim or interest of such class, the plan—
   (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
   (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;
   . . .
   (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law.

with the treatment by other courts of the Bankruptcy Code's cure provisions. *Id.* at 1342. Several other courts have followed this rationale. *See, e.g., In re Southeast Company,* 868 F.2d 335, 337 (9th Cir.1989); *In re Udhus,* 218 B.R. 513, 516 (9th Cir.B.A.P.1998); *In re Casa Blanca Project Lenders, L.P. (Casa Blanca),* 196 B.R. 140, 143 (9th Cir.B.A.P.1996); *In re Phoenix Business Park Ltd. Partnership,* 257 B.R. 517, 519 (Bankr.D.Ariz. 2001); *In re Johnson,* 184 B.R. 570, 574 (Bankr.D.Minn.1995); *In re 433 South Beverly Drive,* 117 B.R. 563, 567 (Bankr. C.D.Cal.1990); *In re Singer Island Hotel, Ltd.,* 95 B.R. 845, 848 (Bankr.S.D.Fla. 1989). To date, the Tenth Circuit Court of Appeals, whose decisions bind this Court, has been silent on this issue.

In contrast, Pollack argues § 1123(d)[8] is unambiguous and necessarily requires default interest must be paid as part of a § 1 124(2)(A) cure, notwithstanding prior judicial determinations to the contrary. Some courts have rendered opinions supporting such an argument. *See, e.g., In re Hassen Imports Partnership,* 256 B.R. 916, 924 n. 13 (9th Cir.B.A.P.2000) ("the future of [*Entz–White*] is in doubt, as the 1994 amendments to § 1123 added subsection (d) to provide that the amount necessary to cure a default under a Chapter 11 plan shall be determined in accordance with the underlying agreement and applicable non-

bankruptcy law."); *Casa Blanca,* 196 B.R. at 147 (discussing without determining whether *Entz–White* had been legislatively overruled); *Southland Corp. v. Toronto–Dominion,* 160 F.3d 1054, 1059 n. 6 (5th Cir.1998) (Congress arguably rejected the *Entz–White* decision by adding § 1123(d) and deleting § 1124(3)); *In re Bohling,* 222 B.R. 340, 342 (Bankr.D.Neb.1998) (discussing the 1994 Bankruptcy Reform Act and § 1123(d), but determining the same did not apply to a Chapter 7 case). As with the previous issue, the Tenth Circuit Court of Appeals has yet to rule on this subject.

While on its surface Pollack's argument has some appeal, it contains a major flaw-namely, what happens if § 1123(d) does not or cannot apply. Herein, an examination of the operative documents is illuminating. The Note only defines the rights of the lender upon default and contains no provision allowing the borrower to cure a default after it has occurred. *See Pollack Exhibit A.* Likewise, the Deed of Trust given as security for the Note also lacks any cure provisions. *See Pollack Exhibit D.* As for applicable nonbankruptcy law, Colorado statutory law allows for a cure of a default under a promissory note or deed of trust, *if* the underlying deed of trust is being foreclosed. *See* COLO.REV.STAT. § 38–38–104.[9] If no foreclosure has oc-

---

**8.** Section 1123(d) provides:

Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

**9.** COLO.REV.STAT. § 38–38–401 states in relevant part:

(1) Whenever the default in the terms of the evidence of debt and deed of trust or mortgage being foreclosed is nonpayment of any sums due thereunder, the owners of the

property being foreclosed, any person liable thereon, any guarantor of the evidence of debt, and, if the deed of trust or mortgage being foreclosed was recorded on or after October 1, 1990, any holder of an interest junior to the lien being foreclosed by virtue of being a lienor, lessee, or vendee of, or holder of an easement or a certificate of purchase on, the property, under a recorded instrument, shall be entitled to cure said default if, at least fifteen calendar days prior to the date the foreclosure sale is held, such persons give written notice, attaching true copies of instruments evidencing their right to cure, to the public trustee or sheriff

curred, no other statutory or equitable right to cure a default exists in an action brought solely on a promissory note. *See Smith v. Certified Realty Corp.*, 41 Colo. App. 170, 585 P.2d 293, 294 (1978), *aff'd*, 198 Colo. 222, 597 P.2d 1043, 1044 (1979). There is no evidence in this case that a foreclosure proceeding has been initiated by Pollack. As a result, there is no contractual ability nor right under nonbankruptcy law which clarifies the amounts necessary to be paid to cure any Note defaults. Thus, in this case, it does not appear there is any basis for arguing that § 1123(d) abrogates the *Entz–White* line of cases.

However, even assuming *Entz–White* is still valid (and applicable in this Circuit), default interest may be allowable in certain circumstances. A bankruptcy court in Arizona addressed this issue in the case of *In re Phoenix Business Park Ltd. (Phoenix)*, 257 B.R. 517 (Bankr.D.Ariz.2001). In *Phoenix*, the secured creditor argued under § 1123(d) default interest must be paid as part of any § 1124(2) cure. The Court, however, after analyzing § 365(b)(2)(D), a provision added at the same time as § 1123(d), and the legislative history of § 1123(d), determined congressional intent was squarely contrary to the secured creditor's argument and ultimately held:

> Congress did not legislatively overrule *Entz–White*, that *Entz–White* remains good law in the Ninth Circuit and that, therefore, a debtor need pay interest only at the contract rate, and not the default rate, and need not pay late

> conducting the sale of their intention to cure said default.

charges in order to effectuate a cure under § 1124(2).

*Phoenix*, 257 B.R. at 522.

Although the Arizona Bankruptcy Court was bound by *Entz–White*, the Court specifically noted, "[t]hus, if a default interest rate is a 'penalty rate,' then it does not need to be paid as part of a section 1124(2) cure." *Id.* at 521. This language is significant because it suggests that even under the reasoning employed in *Entz–White*, if a default rate is not considered a penalty, default interest may nevertheless be appropriate to effectuate a § 1124(2)(A) cure. *See* Bruce H. White and William L. Medford, *Assumption of Executory Contracts and Curing Defaults: In the Interest of Penalties*, Am.Bankr.Inst.J. 28 (Oct.2002) ("Based on the *Phoenix Business Park* holding, a 'default rate' is acceptable as long as it is not found by a court to be a penalty rate.").

In this case, the relevant terms of the Note provide,

> DEFAULT RATE: In the event of a default under this Note, the Lender may *in its discretion*, determine that all amounts owed to Lender shall bear interest at the lesser of 21.00 [*sic*] or the maximum interest rate Lender is permitted to charge by law. (emphasis added).[10]

*Pollack Exhibit A.* Of even more critical importance in this case, the parties stipulated that in the event the Court determines default interest is acceptable, 21% default interest is reasonable.[11] Thus, as a result of this stipulation, the Court need not determine whether the default rate is a

---

**10.** In the event of a default, the terms of the Note provide the Note holder may also assess late charges and attorney's fees.

**11.** Colorado law allows default interest, as long as it is not usurious. *See In re Wood Family Interests, Ltd.*, 135 B.R. 407, 409 (Bankr.D.Colo.1989); *see also Dikeou v. Dikeou*, 928 P.2d 1286, 1289–90 (Colo.1996) (late charges and default interest are enforceable under Colorado law).

penalty rate of interest as the argument was never raised and the rate was not challenged as such.

After reviewing the relevant legal authority noted above and the particular facts and circumstances herein, the Court finds, if a default exists in this case, default interest may be applied to the Note regardless of the applicability of *Entz–White*.

## 2. The Period During Which Default Interest Should Accrue

■ As indicated previously, in the event of a default, the terms of the Note specifically provide the Note holder may *in its discretion* determine all amounts due and owing bear interest at 21%. *See Pollack Exhibit A*. Pollack argues this language allows him retroactively to apply the 21% default rate of interest to all unpaid balances on the Note beginning from the time the Debtors stopped making payments on the Note, even though Pollack was not the holder of the Note at the time the payment default occurred.[12][13]

In contrast, the Debtors assert Servicing did not exercise its discretion to invoke any of the default provisions contained in the Note. Servicing transferred the Note to Pollack on or about September 15, 2005. In a letter written to Richard Sweet dated September 12, 2005 (the "Letter"), Servicing indicated the Total Payoff on the Note

was $351,514.20 with a *Per Diem* rate of $75.43. *See Debtors' Exhibit 5*. Importantly, directly below the Total Payoff and the *Per Diem* is the statement, "... [t]he current interest rate is 8.7500% ...." Thus, as of September 12, 2005, three days prior to Pollack's purchase of the Note, it does not appear Servicing had exercised its discretion under the terms of the Note to charge default interest on all unpaid amounts.

In addition to the Letter, Servicing had previously corresponded with Mr. Sweet (dated August 17, 2005), indicating the interest rate on the Note would increase from 8.75% to 9.5%. *See Pollack Exhibit I*. The increase in the interest rate is based on the terms of the variable rate Note and not upon any assertion of a default. Further, the Debtors produced an e-mail dated July 13, 2005, written by Dan Miller[14] and addressed to Pollack, indicating a payoff amount on the Note that was not calculated at a default interest rate.[15] Finally, on August 3, 2003, Servicing filed a proof of claim in this case. Significantly, the proof of claim provides a payoff figure of $345,587.78, plus arrearages bearing interest at 10.75%. *See Debtors' Exhibit 6*.

Notwithstanding the aforementioned documents, Pollack argues a default letter dated May 2, 2003, sent by Servicing to the Debtors, evidences Servicing had exer-

---

**12.** Mr. Sweet testified he ceased making payments to Servicing in approximately January of 2003. Because the terms of the Note required the Debtors make payments beginning April 1, 1999 and continuing through March 1, 2029 and the Debtors admit they failed to make these payments, it is difficult to imagine how the Debtors are not in default of the payment terms contained in the Note. Thus, a payment default exists as of January 2003.

**13.** Pollack primarily relies upon *In re Coykendall*, 265 B.R. 859, 864 (Bankr.N.D.Ohio 2001) and *Nebraska Beef Ltd. v. Wells Fargo Business Credit, Inc.* 2004 WL 167126, *5

(Jan. 20, 2004 D. Minn.) (unpublished disposition) for this proposition.

**14.** Prior to representing Mr. Pollack in this matter, Dan Miller represented Servicing and had e-mailed Pollack with *information* concerning the balance owed on the Note. *See Debtors' Exhibit 3*.

**15.** The e-mail from Dan Miller to Pollack indicates the payoff amount on the Note as of July 15, 2005 is "$346,807.54 @ 8.75% (no calculation at default rate)" and was in "perpetual default." *Debtors' Exhibit 3*.

cised its discretion to charge default interest. *See Pollack Exhibit G.* The May 2, 2003 letter merely indicates, "[t]his letter is to inform you that your loan with us is in default. . . ." *Id.* The remainder of the letter addresses arrears on property taxes and requests Mr. Sweet contact Servicing to discuss his intentions with regard to the account. Thus, contrary to Pollack's assertions, the letter does not evidence the exercise of any discretion to charge the default rate of interest or invoke any of the default provisions contained in the Note.

Pollack alternatively suggests the communications between Servicing and the Debtors are of little relevance in this case, because the terms of the Note provide the holder may invoke a default and the remedies attendant therewith, including default interest and late charges, without providing notice of default to the borrower. In this regard, the Note specifically provides,

> RIGHTS OF LENDER ON DEFAULT: If there is a default under this Note, Lender will be entitled to exercise one or more of the following remedies without notice or demand (except as required by law).

*Pollack Exhibit A.* Therefore, Pollack argues the Note did not require Servicing nor himself to declare a default and demand default interest on the unpaid balance.

There was no evidence Servicing had ever expressed an intention to exercise its discretion to charge default interest. In fact, all of the evidence presented to the Court establishes Servicing neither intended to nor actually imposed default interest against the Debtor. Therefore, Pollack's alternative argument is unpersuasive. Accordingly, the Court finds Pollack may not retroactively substitute his discretion for that of Servicing in order to apply default interest to the May 2, 2003 letter when Servicing first noted a default in the Note.[16] The question remains, however, whether Pollack exercised his discretion to charge default interest from the time he purchased the Note.

As indicated previously, Pollack purchased the Note from Servicing on September 15, 2005. As a fallback position, Pollack asserts he is entitled to default interest from this time to the effective date of the Plan. Pollack directs the Court's attention to documents provided to him by his attorney Dan Miller indicating he relied upon the assumed fact he would be entitled to charge default interest, late charges and attorney's fees in deciding to purchase the Note. *See Pollack Exhibit M.* Additionally, Pollack testified he would not have purchased the Note for investment purposes or otherwise, had he not believed he was entitled to charge default interest, late charges and attorney's fees. Based on the evidence before it, the Court finds Pollack intended to charge default interest on the Note immediately upon acquiring the same, and is thus entitled to charge default interest on *all amounts* owed as of the time he purchased the Note on September 15, 2005. *See Pollack Exhibit A.*

Because the parties have stipulated the 21% default interest rate is reasonable, the Court need not address whether the rate is a penalty. *See Phoenix,* 257 B.R. at 522. Accordingly, the remaining issue is the amount of default interest the Debtors will be required to pay on the effective

---

16. No evidence was presented by either party regarding whether Mr. Sweet was ever in default as to the original Note holder, First Community Industrial Bank (the "Bank"), or whether the Bank had ever exercised its discretion to charge a default interest rate. Accordingly, under any argument, Pollack could not retroactively assert a default rate of interest during this time period.

date of the Plan. The parties have stipulated to the admission of Exhibit 10 providing such calculation. Therefore, the Court finds on the effective date of the Plan as provided for by the Debtors' Modification, Pollack is owed $282,064.70 which includes default interest on all items as limited by the above. This amount is payable pursuant to the terms of the confirmed Plan and the Modification made thereto and is included as part of the "cure" amount pursuant to § 1124(2)(A).

### 3. Damages under § 1124(2)(C)

Section 1124(2)(C) provides for Pollack to be compensated for "damages" incurred as a result of his reasonable reliance on either a contractual provision provided in the Note or the Deed of Trust or applicable law. What Congress intended by the term "damages" is unclear. *See In re Rolling Green Country Club (Rolling Green)*, 26 B.R. 729, 733 (Bankr.D.Minn. 1982). However, "[t]he word 'damages' must be given a meaning consonant with the overall thrust and meaning of the section within which it is contained." *Id.* The statute makes clear that any damages awarded under this subsection must be the result of a creditor's reasonable reliance on a contractual provision or applicable law.

In this case, the Debtors' Modification provides, in relevant part, the "Class 8 creditor shall be paid by the cure and deceleration of any default under the promissory note and payment in full of such amount plus any amount which the Class 8 creditor may be entitled to as damages under 11 U.S.C. § 1124(2)." *Modification*, p. 2, Article IV. The Modification does not specify the type or extent of damages it proposes to pay under § 1124(2)(C). However, the Modification further provides that if any such amounts are in dispute, they shall be determined by this Court. *Id.* Therefore, the Court will

endeavor to determine what damages are payable under the Modification and § 1124(2)(C).

Pollack's overall request asks the Court to award default interest, attorney's fees, costs and late charges in this matter. Since the Court has previously addressed default interest pursuant to its "cure" analysis under § 1124(2)(A), the Court need only determine whether attorney's fees, costs and late charges fit under the definition of "damages."

### A. Attorney's Fees and Costs

With regard to the award of attorney's fees and costs, the Note provides,

COLLECTION COSTS: If Lender hires an attorney to assist in collecting any amount due or enforcing any right or remedy under this Note, Borrower agrees to pay Lender's attorney's fees, to the extent permitted by applicable law, and collection costs.

Courts addressing damages under § 1124(2)(C) have generally allowed expenses such as attorney's fees, foreclosure costs, court costs and other charges related to a creditor's reasonable reliance. *See, e.g., Phoenix*, 257 B.R. at 523 (legal fees, foreclosure notice fees, court costs, and the like are allowable under § 1124(2)(C)); *In re Arlington Village Partners, Ltd.*, 66 B.R. 308, 317 (Bankr.S.D.Ohio 1986) (interest on arrearages, fees, costs and charges based on creditor's reasonable reliance are allowable); *In re Orlando Tennis World Development Co., Inc., (Orlando)* 34 B.R. 558, 560 (Bankr.M.D.Fla.1983) (contract interest, pre-acceleration late charges, attorney's fees and expenses incurred in pursuit of judgment and foreclosure are appropriate under § 1124(2)(C)); *Rolling Green*, 26 B.R. at 733 (attorney's fees and out-of-pocket losses are allowable). However, some courts have determined things such as compensatory damages or dam-

ages resulting from the economic loss of expectation are not allowable under § 1124(2)(C). *See, e.g., In re Forest Hills,* 40 B.R. 410, 414–415 (Bankr.S.D.N.Y.1984) (creditors are not entitled to compensatory damages under § 1124(2)(C)); *In re Rainbow Forest Apartments,* 33 B.R. 576, 578–79 (Bankr.N.D.Ga.1983) (debtor is not required to pay the present economic cost of its agreement); *In re Kizzac Management Corp.,* 44 B.R. 496, 501 (Bankr.S.D.N.Y. 1984) (Congress did not find it necessary to compensate the creditor for lost opportunity cost). Based on the above cited legal authority it would appear that Pollack's request for attorney's fees is allowable under the damages provision of § 1124(2)(C), as long as Pollack relied on an existing contractual provision in the Note or Deed of Trust or on applicable law.

Pollack testified he purchased the Note knowing it was in default. Prior to his purchase he reviewed the terms of the Note and was aware the Note contained a variable interest rate, a default interest rate, late payment language, and a provision for collection of fees and costs, as well as language providing the lender did not need to provide notice of a default. *See Pollack Exhibit A.* Pollack's uncontroverted testimony was that he relied upon all of these provisions in deciding to purchase the Note.

Additionally, prior to purchasing the Note, Pollack's attorney provided him with a copy of an excerpt from *Colliers on Bankruptcy. See Pollack Exhibit M.* Mr. Miller, although not certain, advised Pollack that if he purchased the Note, attorney's fees would likely be allowed. Pollack relied on this advice and further testified that he would not have purchased the Note had he not been able to collect this expense, because otherwise the purchase of the Note would not have been a good

investment. Based on this unchallenged testimony, the Court finds Pollack relied upon those provisions contained in the Note regarding the collection of attorney's fees and costs. Therefore, both attorney's fees and out-of-pocket costs are allowed as damages pursuant to § 1124(2)(C).

Not all attorney's fees, however, fall into this category. Clearly, the attorney's fees incurred in connection with the within claim challenge are compensable. Likewise, the fees incurred in objecting to the confirmation of the Plan are collection costs. These compensable attorney's fees are damages which must be paid as part of the cure of the Note. *Phoenix,* 257 B.R. at 522. Any attorney's fees relating to the purchase of the Note are not compensable as damages under § 1124(2)(C) because those fees are more appropriately considered an investment expense, rather than a damage resulting from reasonable reliance upon the provisions of the Note or Deed of Trust.

### B. Late Charges

■ The Note provides the following language regarding late charges:

LATE PAYMENT CHARGE: If a payment is received more than 10 days late, Borrower will be charged a late payment charge of $15.00 or 5.000% of the payment amount, whichever is greater ..., as permitted by law.

In this case, the parties have stipulated to the amount of late payment charges should the Court allow the same. *See Exhibit 11.* However, under § 1124(2)(C), Pollack must demonstrate that he incurred damages as a result of his reasonable reliance upon the late payment language. In this Court's estimation late payment charges differ from attorney's fees and costs that may be allowed as damages under § 1124(2)(C). Attorney's fees and costs are expenses a creditor *actually* in-

curs as a result of its reasonable reliance on the terms of an agreement or applicable law and the enforcement of a creditor's legal rights. Although Pollack testified he relied upon the late charge language in purchasing the Note, he did not incur any *actual* expenses similar to his attorney's fees and costs by virtue of his reasonable reliance.

Furthermore, under the particular late payment language cited above, the Court notes the purpose of the late charge language appears to have no direct financial relationship to the cost of collection or default. Rather, it appears the provision is simply to induce timely payment of monthly payments on the Note. This cannot constitute damages incurred as a result of Pollack's reasonable reliance.[17] Therefore, the Court finds the late charges are not damages under § 1124(2)(C). *See Orlando*, 34 B.R. at 561 (while the court allowed late charges to the date of acceleration, those late charges post-acceleration were not related to anticipated economic loss, but rather were in the nature of a penalty and not compensable under § 1124(2)(C) as damages).

## CONCLUSION

For the foregoing reasons, the Court finds Pollack's claim in this case shall include a default rate of interest at 21% beginning on September 15, 2005, through the effective date of the Plan and shall be paid as part of the "cure" under the Plan and Modification. Additionally, reasonable attorney's fees and costs are allowed as damages under § 1124(2)(C). Pollack's legal fees, pursuant to the parties Stipulation, will be determined at a further hearing. *See Stipulation,* ¶ 12. Late payment

charges are not compensable under § 1124(2)(C). Accordingly,

IT IS ORDERED Pollack's allowed claim in this case is determined to be $282,064.70 and must be paid pursuant to the terms of the Debtors' Plan and Modification.

IT IS FURTHER ORDERED a scheduling conference shall be held on **Friday, September 1, 2006, at 10:00 a.m.** to set a hearing to determine the amount of additional attorney's fees that have accrued as a result of Pollack asserting his claim. If those attorney's fees are determined to be reasonable, those amounts shall be added to Pollack's allowed claim.

---

**17.** Additionally, some courts have determined, albeit under § 506(b), a creditor may not be paid late charges as well as default interest because the payment of both would

amount to a double recovery. *See In re AE Hotel Venture*, 321 B.R. 209, 216 (Bankr. N.D.Ill.2005) (citing cases).